THAYER AMUSEMENT CORPORATION *vs.* BENJAMIN P. MOULTON, *et al.*

JULY 17, 1939.

PRESENT: Flynn, C. J., Moss, Capotosto, Baker and Condon, JJ.

184

CONDON, J. This is a petition for a writ of *certiorari* directed to the bureau of police and fire of the city of Providence to send up its records relating to its action and decision with respect to certain applications and petitions of the Thayer Amusement Corporation for licenses to show the motion picture "Professor Mamlock" at the Avon Theatre on Sunday, March 26, 1939, and on the week-days next following. After a preliminary hearing before us on whether the writ should issue, we issued the writ, and the cause was later fully heard on its merits.

The records of the bureau show that, on January 31, 1939, its amusement inspector reported to the bureau that the Avon Theatre was planning to show "Professor Mamlock" and that the motion picture had been privately exhibited to him and his assistant. As a result of this private view, he and his assistant disapproved of the picture for public

showing in the city of Providence, on the grounds that it was communistic propaganda; that it tended to provoke class and race hatred; and that it did not have the approval of the national board of review of motion pictures. There is an express provision, in the statutes, permitting the showing of motion pictures on Sunday, that no license shall be issued for any picture not approved by that board. P. L. 1926, chap. 791. After the members of the bureau had personally viewed the picture at the request of the manager of the Avon Theatre, the bureau confirmed the action of its inspector and banned the picture.

The petitioner had not then made any formal application for a license to show the picture. Later, however, on March 8, 1939, petitioner's counsel appeared before the bureau and asked the members to reverse their decision banning the picture or to suggest changes to be made in it that would satisfy them. The bureau denied both requests, and intimated that no formal application for a license had been filed. Counsel then said applications would be filed and asked that a hearing be granted. An application for a license to show the picture on Sunday, March 26, 1939, and an application for a license for the week days following were later filed, together with a formal petition for a hearing on the same. Each application was formally disapproved by the amusement inspector of the bureau on March 11, 1939, and the bureau formally denied them in meeting on March 15, 1939, without granting the request for a hearing.

Accompanying the record and forming a part thereof are a number of letters received by the bureau with reference to their action in banning the picture and also some published comment and criticism of the picture in the National Board of Review Magazine and in newspaper clippings. This information, we assume, was before the board when it denied the petitioner's formal applications on March 15, 1939.

The petitioner now contends that this court should review the action of the bureau, on the ground that it committed an error of law in denying petitioner's applications, without granting it a hearing, and also that there was no legally competent evidence before the bureau upon which to base its decision. No attack is made upon the jurisdiction of the bureau to refuse or grant a license in its discretion, but merely an attack upon the decision itself as an abuse of that discretion.

However, the petitioner further contends that, if the action of the bureau is not beyond the authority granted to it by the statutes under which it purports to function, then those statutes are unconstitutional and void, because they violate article I, secs. 10 and 20, article III and article XII, section 1 of the constitution of Rhode Island, and article XIV of amendment, section 1 of the constitution of the United States.

The respondent bureau denies these contentions of the petitioner and strongly urges that *certiorari* does not lie to review its action in this particular case. It points to the fact that the procedure which it followed, in considering these applications and in finally denying them, is of long standing and has been uniformly adopted as the proper manner in which to exercise the power granted to it by the legislature to license shows and exhibitions. It also asserts, and the assertion is not denied, that this procedure is followed in considering applications from all other theatres in the city. Moreover, the respondent argues that "the General Assembly apparently vested the power" to grant or refuse licenses for shows and exhibitions "in licensing bodies throughout the state and gave them very broad powers"; and it adds that "it is fair to conclude that the General Assembly intended for the licensing bodies to have almost absolute power with regard to the granting or withholding of a license."

The record does not show that the respondent bureau has adopted any rules or regulations governing the granting or refusing of motion-picture licenses; but the bureau contends that the statute does not require it to do so and cites as authority for this contention *State* v. *Barrett,* 20 R. I. 313. The petitioner, although it does not appear to have covered the point in its brief, alleges in its petition that this failure of the bureau to prescribe rules and regulations constitutes not only a violation of the enabling act authorizing the bureau to grant or refuse licenses but also of the above-cited provisions of the federal and state constitutions. Thus a question of statutory construction and one of constitutional law are raised by the petitioner, both as to the bureau's procedure and as to the statute itself, if it is found that such procedure does not violate the statute.

The matter in controversy may thus be said to raise the following questions: 1. Does *certiorari* lie to review the action of the bureau in this particular case? 2. Did the bureau's refusal to grant the petitioner a formal hearing on its applications constitute a violation of the enabling statute and a denial of due process of law? 3. Does the record disclose that the bureau denied said applications without any competent, that is substantial, evidence to support its decisions? 4. Is the statute granting the bureau the power to license motion picture shows constitutional, if it does not require the bureau to hold a hearing and afford the applicant for such license an opportunity to offer evidence in support of its application, or if it vests in the bureau an absolute discretion to grant or refuse licenses?

The first question may be answered in the affirmative. The action of the bureau, in denying the petitioner's applications for licenses, is a final determination. The statute authorizing the bureau to act in these matters does not provide an appeal from its decisions. In this particular case, the petitioner has clearly raised several questions of law,

and there does not appear to be any adequate remedy that can be invoked for the determination of such questions, except *certiorari.*

In a situation of this kind, whether or not the bureau is acting in a judicial capacity is not important, as questions of law have been raised which call for the exercise of the broad powers of this court under the state constitution. "The office of the writ" of *certiorari* "has been somewhat extended in this state by statute and by the decisions of this court for the purpose of carrying out the revisory and appellate power conferred on this court by the constitution. . . ." *Cohen* v. *Superior Court,* 39 R. I. 272, 275; *State* v. *Coleman,* 58 R. I. 6. This court has also said, after holding that the determination of questions of fact by an inferior tribunal is, in general, conclusive, "yet by the common law a supreme court has power to review their proceedings upon questions of jurisdiction and questions of law, these questions being of a judicial nature." *Lonsdale Company* v. *License Commissioners,* 18 R. I. 5, 10.

The questions of law which the petitioner has raised, involving construction of the statute and the conformity of the statute to the federal and state constitutions, are in themselves sufficient to warrant the exercise of our discretion in granting the writ, whether or not the respondent was exercising a judicial function or a purely administrative function in considering the petitioner's applications for licenses. But, in the absence of such questions being raised, we repeat what has been formerly said by this court in *Greenough* v. *School Committee of Pawtucket,* 27 R. I. 427 at page 428: "It is well settled that in this state the common-law limitations of *certiorari* prevail which confine it to the review of the judicial action of inferior courts or of public officers or bodies exercising under the law judicial or quasi judicial functions." See also *Messier* v. *Healey,* 55 R. I. 1.

Having come to the conclusion that it is our duty to issue the writ and bring up the bureau's record of its action for our examination, it now becomes necessary to determine just what function the bureau performs in granting or refusing a license for a public showing of motion pictures. Is it a purely administrative function necessarily delegated to the bureau to carry out more effectively the policy of the legislature or is it a combination of that function and a judicial or quasi-judicial function more or less inextricably intertwined with each other? If it is the latter, then, under our decisions in this state, its actions may be reviewed and the evidence before it examined to determine whether or not the bureau acted upon substantial grounds supported by any competent evidence. *Chace* v. *City Council of Providence*, 36 R. I. 331; *McCarthy* v. *Aldermen, Central Falls*, 38 R. I. 385. If, however, it is the former, and the bureau has acted in accordance with law, then its decision is purely discretionary and not reviewable by this court. *Dexter* v. *Town of Cumberland*, 17 R. I. 222; *Child* v. *Bemus*, 17 R. I. 230; *Horton* v. *Old Colony Bill Posting Co.*, 36 R. I. 507, 555; *Coggeshall* v. *Harbor Commission*, 50 R. I. 175; *State* v. *Conragan*, 58 R. I. 313, 320, 322.

In order to determine this question, it will be helpful to consider what is the legal nature of the licenses for which the petitioner applied. Is the public showing in the city of Providence of a motion picture, to which the general public is invited upon the payment of an admission fee, a right or a privilege? It would seem that there can be no doubt that it is a privilege. Charter & Special Laws Governing the City of Providence of 1916, sec. IX, clause 1, (G. L. 1866, chap. 598); *ibid.*, p. 167, P. L. 1901, chap. 930, sec. 6.

Motion pictures are undoubtedly within the category of shows and exhibitions, and for more than a century these have been considered along with rope or wire dancing, wrest-

ling, boxing, and sparring matches, and also roller skating and dancing in rinks and public halls, as subject to regulation and even prohibition under the police power of the state. By virtue of G. L. 1923, chap. 129, as amended by P. L. 1926, chap. 791, section 1; P. L. 1928, chap. 1154, section 1; chap. 1160, section 1; and P. L. 1932, chap. 1876, section 1, such shows and exhibitions are forbidden, except upon a license from the town council, city council or board of police commissioners, or other licensing body in the several cities and towns. And the statute provides that any such license may be revoked at the pleasure of the local licensing authority.

It may be observed here that chap. 129 appears in the general laws of 1923 under title XV of "Internal Police", and under that same title significantly appear chapter 127, "Of Enforcing Prohibition of Intoxicating Liquors", chap. 130, "Of Bowling Alleys, Billiards and Shooting Galleries", chap. 131, "Of Pawnbrokers", and also a series of other chapters pertaining to the ordering and policing of numerous activities. And the above-mentioned chapters also appear in the revision of general laws of 1938 under title XXXIV, "Business and Police Regulations."

In *Child* v. *Bemus, supra,* this court said that a hackney license was a privilege and that revocation of such a license by the mayor, without a hearing, was not unreasonable or oppressive, pointing out the power thus given to the mayor "was for administrative not judicial purposes". And in Massachusetts in a like case the court said: "A license such as those here in question is a mere privilege or permission and in no sense a contract or property." *Burgess* v. *Mayor of Brockton,* 235 Mass. 100. In that case the court upheld the action of the mayor in revoking a jitney license without a hearing, and stated that the power under a statute to license did not impose an obligation to grant licenses.

This court has held that a license to set fish traps in the public waters of the state is a privilege and that the applicant for such a license is not entitled to a formal hearing before denial of his application. *Coggeshall* v. *Harbor Commission, supra.* And in *State* v. *Conragan, supra,* we recently said: "A certificate to operate a school of hairdressing and cosmetic therapy is nothing more than a license to do that which the state otherwise declares to be unlawful. Although the privilege conferred by the certificate may be valuable, it is neither a contract nor a property right within the constitutional meaning of those words. The permission thus granted remains at all times subject to complete control by the state."

And in *LaPlante* v. *State Board of Public Roads,* 47 R. I. 258, it was held that a license to operate a motor vehicle was not property and could be suspended without a hearing. The right to such a license in the first instance has been held to be subject to a broad discretion in the board of public roads to grant or refuse it. *Glass* v. *State Board of Public Roads,* 44 R. I. 54.

None of the above-cited cases deal with the denial of a license for conducting a show or exhibition or for the public showing of a moving picture, and we have not found any reported or unreported case in this court where the denial of such a license by the local licensing authority was ever brought here for review. This in itself is of no little significance when we find that the statute under which the local licensing authorities derive their power to license shows and exhibitions was on the statute book at least as early as 1822 and has remained thereon continuously ever since that year.

Is this an indication that no one ever before thought that an applicant for a license had a right to complain to this court if his application was denied? It would seem so, or

else throughout the years the licensing authorities have been remarkably fair and liberal to those applying for such licenses. We think that in this state, and probably generally, at least in the New England states, the governmental attitude toward public shows and exhibitions has been one of police regulation and, at times even of prohibition. For a discussion of the right to conduct amusements in Massachusetts without a license see *Opinion of the Justices to the Senate,* 247 Mass. 589. See also dissenting opinions of *Holmes, J.,* and *Stone, J.,* in *Tyson* v. *Banton,* 273 U. S. 419, 445, 447, and note on page 449.

For our part, we recognize the total absence of any previous cases of the character of the instant one in this court as indicative of a well-understood belief in this state that a license to conduct any kind of a show or exhibition within the meaning of the statute was a mere privilege; and that the granting of such a license rested in the discretion of the licensing authority.

We think this court must have had the same idea when, in passing upon the validity of an ordinance of the city of Providence regulating outdoor advertising on billboards and vesting in the board of police commissioners power to approve or disapprove such advertising in its discretion, it said, in *Horton* v. *Old Colony Bill Posting Co.,* 36 R. I. 507 at 534: "Section 11 prohibits the display of immoral or indecent matter or depiction of crime upon such structures and requires the written approval of the board of police commissioners of all matters displayed.

"Argument here is superfluous. The aim of the provision is the moral welfare. Such structures uncensored might easily become a most dangerous menace to the community. No case has denied the validity of such a provision; several expressly concede the right to prohibit immoral or indecent displays." And at page 555, the court further said: "The powers conferred upon the police commission, are not judi-

cial powers under Art. X, Section 1, above quoted. This principle has been so often set forth in this state and elsewhere that the citation of many cases is not necessary."

In Illinois it has been held that no hearing was necessary before the police authority, prior to the refusal of permission to publicly show a motion picture. *Block* v. *Chicago,* 239 Ill. 251, 265. In that case the court inferentially held the public showing of a motion picture was a privilege and, in response to the explicit argument advanced before it that some sort of a hearing was necessary to protect and preserve the rights of the applicant for a license, said: "We know of no decision sustaining such a doctrine and counsel do not appear to have found any. As we have already seen, there is no lawful objection to the determination of the question by the chief of police."

In *Dreyfus* v. *City of Montgomery,* 4 Ala. App. 270, 58 So. 730, the court said of a license to show motion pictures: " . . . the license was but a privilege revocable at the pleasure of the authorities granting it . . . ." And in *Higgins* v. *Lacroix,* 119 Minn. 145, it was said: "To say the least, opinions are quite at variance as to the merits of moving picture shows as an influence for good or evil in a community. It must therefore be classed among those pursuits which are liable to degenerate and menace the good order and morals of the people, and may therefore not only be licensed and regulated, but also prevented by a village council." See also Frohlich & Schwartz, Law of Motion Pictures & The Theatre, secs. 107, 108, 116.

Under legislative authority not unlike that under which the bureau in the instant case acted, the city council of Houston, Texas, was upheld in vesting in a board of censors power to exclude motion pictures from a public showing in that city. *Xydias Amusement Co.* v. *City of Houston,* 185 S. W. 415, 418. The court in that case said: "Moving picture

exhibitions are subject to police surveillance and control in the interest of public morals, and it is the right and duty of the city of Houston, under its express charter powers and under the general exercise of its police powers, to regulate, permit or forbid such exhibitions, and to this end to appoint a board of censors, clothed with such reasonable authority as is necessary to effect the purposes of their appointment."

The supreme court of the United States has also spoken on this question to the same general effect. In *Mutual Film Corp.* v. *Industrial Comm. of Ohio,* 236 U. S. 230, it forcibly stated the reasons why the public showing of moving pictures fell naturally under the exercise of the police power to the extent of prohibition as well as regulation as follows: ". . . there are some things which should not have pictorial representation in public places to all audiences. And not only the State of Ohio but other States have considered it to be in the interest of the public morals and welfare to supervise moving picture exhibitions. We would have to shut our eyes to the facts of the world to regard the precaution unreasonable or the legislation to effect it a mere wanton interference with personal liberty. . . . The judicial sense supporting the common sense of the country is against the contention. As pointed out by the District Court, the police power is familiarly exercised in granting or withholding licenses for theatrical performances as a means of their regulation." See also *Mutual Film Corp.* v. *Hodges, Governor of Kansas,* 236 U. S. 248; *Message Photo-Play Co., Inc.* v. *Bell,* 179 App. Div. (N. Y.) 13.

In the latter case the New York court disposed of an argument by the exhibitor based on constitutional grounds in this manner: "We are not concerned with the freedom of speech guaranteed by the Constitution (Art. 1, §8). We have to do with the question of revoking a license, which is not property but merely a temporary permit to conduct a business that would be unlawful without it. . . . This ac-

tion necessarily rests on a concession that the plaintiff has no constitutional or other right, on the theory of freedom of speech or of the public press or otherwise, to give public exhibition of the film in question at an *unlicensed* theatre."

In our examination of the authorities, we have found but one case that seems, in principle at least, *contra* to the view that such a license is a mere privilege without any element of contract or property right. *City of Dallas* v. *Urbish*, 252 S. W. 258. In that case the Texas court overthrew an ordinance which prohibited the erecting and maintaining of a motion picture theatre in a certain residential district of the city of Dallas, on the ground that the ordinance deprived the property owner of his property without due process of law. As a contrast to this case see *Kistler* v. *Borough of Swarthmore,* 134 Pa. Super. 287, 4 A. 2d. 244, where, under somewhat similar circumstances, the Pennsylvania court held that a general act conferring power on borough officers to regulate, license or prohibit theatrical exhibitions, etc., conferred power on a borough to enact an ordinance prohibiting the construction of motion picture theatres within the borough.

On the whole we are clearly of the opinion that the adjudicated cases in this state point to the conclusion that a license to show motion pictures publicly for a price is necessarily a mere privilege and not in any sense a right of property. Such also appears to be the law elsewhere. See Frohlich & Schwartz, Law of Motion Pictures & The Theatre, secs. 107, 108. And further, this being so, the applicant for a license has no right to a hearing before his application is denied, unless the statute expressly authorizes one or one is necessarily implied by the language of the statute. There is no such express provision or necessary implication in the language of the statute under which the bureau exercised the power to refuse licenses to the petitioner in the instant case. Indeed, as noted above, the statute even grants the

power to revoke a license at the pleasure of the licensing authority.

In *Narragansett Racing Assoc. v. Kiernan*, 59 R. I. 79, 194 A. 49, which the petitioner cites and strongly relies on in his brief, we were not dealing with either the granting or the revoking of a license but with the decision of the state division of horse racing finding an officer of the association guilty of violating a rule of the division and its order, based on that decision, directing the association to remove such officer. In the statute creating the division and prescribing its duties, the legislature provided that the division should have the right "for cause" to require the removal of any employee or official employed by any licensee. Because of this language, we held that the division of horse racing was performing a judicial function when acting under that provision. On this ground we inquired into its action and found there was an entire lack of substantial evidence to support its decision.

In the second case, *Narragansett Racing Assoc. v. Kiernan*, 59 R. I. 90, 194 A. 692, the question before us was a pure question of law as to whether the division committed error in refusing to allow the petitioner to introduce testimony on its motion to disqualify the chairman of the division, on the grounds of personal interest, bias and prejudice, and in denying such motion without hearing such evidence. The question of granting, revoking or refusing a license to conduct horse racing under the statute did not enter into our decision in that case and we expressed no views thereon in our opinion. The question of the suspension of the Association's license, which was the matter the division, with its chairman presiding, attempted to hear and determine, and which under the statute it had a right to suspend "for cause", was not passed upon by us, as the question raised by petitioner's motion to disqualify the chairman was decisive of the case and resulted in the quashing of the record

brought up by the writ. Neither case is in point, therefore, on the question now before us.

Having found that the licenses which the petitioner in the instant case was seeking are privileges which may be granted or refused in the discretion of the bureau, its refusal to grant the petitioner's request for a hearing is of no importance. A goodly number of the authorities above cited, and many others that could be cited, hold that, under such circumstances, a hearing is not requisite to the validity of an administrative board's decision. It is because the action of the bureau on such applications was not in its nature judicial but rather administrative that no hearing was required.

It may be that there would be less danger of arbitrary action if a hearing were made a prerequisite; but that is a matter for legislative consideration, and not for us. The bureau therefore did not commit an error of law in refusing to grant the petitioner's petition for a hearing and opportunity to present evidence, and its failure to prescribe rules and regulations governing its action in such matters does not vitiate its proceedings. *State* v. *Barrett, supra.*

The next question is whether or not the bureau's decisions denying petitioner's applications for licenses are supported by any competent or substantial evidence. The petitioner has requested us to view the picture and has filed a motion here to that effect. We have not complied with that request and we now deny the motion because, on *certiorari,* we are confined to the record which has been brought up by the writ. Under no circumstances does this court undertake on *certiorari* to review the findings of fact by an inferior tribunal, or to weigh the evidence which it had before it and on which the tribunal rested its decision.

In the present matter, the important evidence, if not indeed the only legal evidence, is the picture itself. The rec-

ord shows that the bureau viewed the picture. It also shows that it had the benefit of the report of its inspector and deputy inspector of amusements; that it also had the expert comments and criticism of some critics in the art of the motion picture, as well as some favorable and some unfavorable reaction, evidenced by way of letters received in the mail, to the possibility of a public showing of "Professor Mamlock".

From the knowledge of the picture which it had thus obtained and in the exercise of its discretion, without any indication of oppressive conduct toward the petitioner, as far as we can see from the record, the bureau came to a definite conclusion. That conclusion was that the public showing of this picture in Providence would not be for the public welfare but rather inimical thereto on account of its tendency to incite race hatred and class strife or to intensify them, especially in view of the present condition of the public mind with respect to the underlying theme of the picture and also because of the nature of the scenes of brutality and bloodshed there presented.

The petitioner's counsel contended before us that this was an exaggerated view of the picture. It is presumably for this reason that the petitioner desired to exhibit the picture to us so that we could form our independent opinion of its theme and judge whether or not it would be inimical to the public welfare to permit it to be publicly exhibited. But it must be obvious that for us to do this would be to put ourselves in the place of the bureau in determining whether the picture ought to be publicly shown. In other words, what the petitioner would have us do is the very thing we cannot do, and that is weigh the evidence. It is beside the point whether, in our judgment, the picture is the harmless thing the petitioner claims it to be, or holds out but little in the way of communistic propaganda and is not too vivid in its scenes of brutality and of racial perse-

cution. That we might take a very different view of the picture, in its possible effect upon the public mind, than the bureau of police and fire took, would not warrant us in reversing their decisions.

There remains, then, only the constitutional questions for us to consider. These were argued by the petitioner only in a general way and they are not more specifically pressed in its brief. Clearly all of them are without merit. The cases cited by the petitioner in support of its general argument of unconstitutionality are plainly distinguishable from the case here. Those cases deal with restrictions imposed on certain businesses and industries which did not require licenses. These restrictions were of an extreme character born of the demand for desperate legislative measures in the face of the great economic storm which burst upon the country at the opening of this decade and which has not yet spent its force. *Morgan* v. *United States,* 304 U. S. 1; *Schechter Poultry Corp.* v. *United States,* 295 U. S. 495; *Panama Refining Co.* v. *Ryan,* 293 U. S. 388. Several other cases cited are cases involving the right of free speech. *Herndon* v. *Lowry,* 301 U. S. 242; *Stromberg* v. *California,* 283 U. S. 359; *Whitney* v. *California,* 274 U. S. 357.

None of these cases relates to the licensing or even the censorship of motion pictures. It has been held that censorship is not in contravention of the constitutional guaranties of freedom of speech and of the press. *Mutual Film Corp.* v. *Ohio Industrial Comm., supra.* And it has also been held that the "privileges and immunities clause" of the fourteenth amendment to the federal constitution applies only to natural persons and does not embrace artificial persons. *Western Turf Assoc.* v. *Greenberg,* 204 U. S. 359.

Petitioner here does not specify what clause or clauses of section 1 of the fourteenth amendment to the constitution of the United States are violated by the above-cited statutes as we have construed them. Under *Blais* v. *Frank-*

*lin,* 30 R. I. 413, this failure to point out the particular provision of the section and article of the federal constitution which the petitioner alleges that the statute contravenes would be sufficient for us to disregard this constitutional objection; but in order to give the petitioner the benefit of a record here, we have treated the objection as applying to each clause of section 1. We have already said that the right to show a moving picture is a mere privilege subject to reasonable police regulation. Therefore, the due process clause of the section is not involved, or at least it is not violated by the procedure which the bureau is authorized to follow under our statute.

Manifestly the statutes under consideration do not delegate legislative power in violation of art. III of the state constitution nor do they violate art. XII, section 1, which has to do with the promotion of education by the general assembly and which is not in any sense a prohibition or restraint upon the legislative exercise of the police power or a guaranty of any rights and liberties of the citizens of the state.

The petitioner fails to specify which of the many clauses of art. I, sec. 10 is violated by the statutes in question, and we ought not to assume that he invokes them all, as many of them have no possible relation to the matter here. However, as this entire section has repeatedly been held to apply only to the rights of the accused in criminal prosecutions— *Creditors' Service Corp.* v. *Cummings,* 57 R. I. 291; *Joslin Mfg. Co.* v. *Clarke,* 41 R. I. 351; *State* v. *Keeran,* 5 R. I. 497 —we need not say more, unless it be to point out the clear and explicit language used by the court in discussing the same contention in the last-cited case.

With reference to the allegation that the statutes in question violate art. I, sec. 20 of the state constitution, we may say that we are in agreement with the opinion of the supreme court of the United States as expressed in *Mutual*

*Film Corp.* v. *Ohio Industrial Comm., supra,* to the effect that the exhibition of motion pictures is not to be regarded as part of the public press. Therefore, sec. 20 can have no application to the instant case.

The writ of *certiorari* heretofore issued is, for the above reasons, quashed, and the record heretofore certified by the bureau of police and fire is ordered sent back to that body.

*William H. Edwards, Bancroft Littlefield, Edwards & Angell,* for petitioner.

*Francis J. O'Brien,* for respondent.