AMERICAN TOTALISATOR COMPANY, INC. *v.* OREST T. DUBNO, COMMISSIONER OF REVENUE SERVICES
(13408)
(13410)

DTP ROYALTY, INC. *v.* JOHN G. GROPPO, COMMISSIONER OF REVENUE SERVICES
(13411)

GTECH CORPORATION *v.* JOHN G. GROPPO, COMMISSIONER OF REVENUE SERVICES
(13412)

PETERS, C. J., SHEA, CALLAHAN, GLASS and COVELLO, Js.

Argued December 16, 1988—decision released March 14, 1989

*Richard K. Greenberg,* assistant attorney general, with whom, on the brief, were *Joseph I. Lieberman,* attorney general, and *Antoinette M. Tease,* legal intern, for the defendant, commissioner of revenue services.

*Scott P. Moser,* with whom, on the brief, were *James Sicilian* and *H. Douglas Bailey,* for the plaintiff American Totalisator Company, Inc.

*George C. Hastings,* with whom was *Richard W. Tomeo,* for the plaintiffs DTP Royalty, Inc., and GTECH Corporation.

CALLAHAN, J. These consolidated appeals and cross appeals were brought to this court from judgments rendered in the Superior Court on appeals brought by the

plaintiffs pursuant to General Statutes § 12-422[1] from deficiency assessments of use taxes, penalties and interest[2] by the defendant commissioner of revenue services (commissioner).[3] The trial court upheld the commissioner's assessment of taxes as to all the plaintiffs but determined that they were not liable for penalties and interest. We find no error.

The essential facts are not in dispute. The plaintiffs American Totalisator Company, Inc. (AmTote), DTP Royalty, Inc. (DTP), and GTECH Corporation (GTECH), at various times contracted with the state of Connecticut acting through the division of special revenue (state) to provide personal property, training, personnel and services to establish systems to enable

[1] "[General Statutes] Sec. 12-422. APPEAL. Any taxpayer aggrieved because of any order, decision, determination or disallowance of the commissioner of revenue services under section 12-418, 12-421 or 12-425 may, within one month after service upon the taxpayer of notice of such order, decision, determination or disallowance, take an appeal therefrom to the superior court for the judicial district of Hartford-New Britain, which shall be accompanied by a citation to the commissioner of revenue services to appear before said court. Such citation shall be signed by the same authority, and such appeal shall be returnable at the same time and served and returned in the same manner, as is required in case of a summons in a civil action. The authority issuing the citation shall take from the appellant a bond or recognizance to the state of Connecticut, with surety to prosecute the appeal to effect and to comply with the orders and decrees of the court in the premises. Such appeals shall be preferred cases, to be heard, unless cause appears to the contrary, at the first session, by the court or by a committee appointed by it. Said court may grant such relief as may be equitable and, if such tax has been paid prior to the granting of such relief, may order the treasurer to pay the amount of such relief, with interest at the rate of six per cent per annum, to the aggrieved taxpayer. If the appeal has been taken without probable cause, the court may tax double or triple costs, as the case demands; and, upon all such appeals which are denied, costs may be taxed against the appellant at the discretion of the court, but no costs shall be taxed against the state."

[2] See General Statutes § 12-415.

[3] The plaintiffs, DTP Royalty, Inc., and GTECH Corporation, also claimed refunds of sales taxes imposed on rental payments they had made to lease equipment used in pursuance of their contracts with the state. The commissioner, in assessing additional taxes, denied both requests.

the state to conduct its lottery, teletrack and off-track betting enterprises.[4] In order to accomplish that purpose the plaintiffs, during the years for which deficiencies were assessed, purchased or leased[5] computers, computer components, computer terminals, paper stock and other tangible items on which they paid no sales tax. Subsequent to conducting audits, the defendant commissioner assessed use tax deficiencies, penalties and interest against all the plaintiffs, reasoning the various items purchased were not acquired for resale but were retail purchases of equipment and material used by the plaintiffs to discharge their contractual obligations with the state. The plaintiffs disagreed with the commissioner's assessments and argued that their purchases were not retail sales as defined by General Statutes § 12-407 (3).[6] They claimed instead that the personal property involved had been purchased for

---

[4] AmTote originally contracted with the state as to teletrack and off-track betting in 1973 and as to the daily lottery in 1977. DTP Royalty, Inc., took over the lottery from AmTote in 1980. GTECH (formerly Gaming Systems Corporation) succeeded DTP by virtue of an assignment from DTP in 1981 and subsequently by an agreement with the state in 1983. Because we believe that all the contracts have the same legal effect and lead to the same result as far as the issue in dispute is concerned, it is not necessary to treat each plaintiff or contract separately.

[5] The leasing or rental of tangible personal property is a "sale" under General Statutes § 12-407 (2) (j).

[6] General Statutes § 12-407 (3) provides in pertinent part: "DEFINITIONS. Whenever used in this chapter . . . (3) 'Retail sale' or 'sale at retail' means and includes a sale for any purpose other than resale in the regular course of business of tangible personal property or a transfer for a consideration of the occupancy of any room or rooms in a hotel or lodging house for a period of thirty consecutive calendar days or less, or the rendering of any service described in any of the subdivisions of subsection (2) of this section. The delivery in this state of tangible personal property by an owner or former owner thereof or by a factor, if the delivery is to a consumer pursuant to a retail sale made by a retailer not engaged in business in this state, is a retail sale in this state by the person making the delivery. He shall include the retail selling price of the property in his gross receipts."

resale and consequently was not subject to the imposition of a use tax under General Statutes § 12-411.[7]

***

[7] "[General Statutes] Sec. 12-411. THE USE TAX. (1) IMPOSITION AND RATE. An excise tax is hereby imposed on the storage, acceptance, consumption or any other use in this state of tangible personal property purchased from any retailer for storage, acceptance, consumption or any other use in this state or the acceptance or receipt of any services constituting a sale in accordance with subdivision (i) of subsection (2) of section 12-407, at the rate of seven and one-half per cent of the sales price of the property or the consideration paid for any such services.

"(2) LIABILITY FOR TAX. Every person storing, accepting, consuming or otherwise using in this state services or tangible personal property purchased from a retailer is liable for the tax. His liability is not extinguished until the tax has been paid to this state, except that a receipt from a retailer engaged in business in this state or from a retailer who is authorized by the commissioner, under such regulations as he may prescribe, to collect the tax and who is, for the purposes of this chapter relating to the use tax, regarded as a retailer engaged in business in this state, given to the purchaser pursuant to subsection (3) of this section is sufficient to relieve the purchaser from further liability for the tax to which the receipt refers.

"(3) COLLECTION BY RETAILER. Every retailer engaged in business in this state and making sales of services or of tangible personal property for storage, acceptance, consumption or any other use in this state, not exempted under this chapter, shall, at the time of making a sale or, if the storage, acceptance, consumption or other use is not then taxable hereunder, at the time the storage, acceptance, consumption or use becomes taxable, collect the use tax from the purchaser and give to the purchaser a receipt therefor in the manner and form prescribed by the commissioner. For the purpose of uniformity of tax collection by the retailer the tax brackets set forth in subsection (3) of section 12-408 pertaining to the sales tax shall be employed in the computation of the tax imposed by this section. . . .

"(9) PRESUMPTION OF PURCHASE FOR USE; RESALE CERTIFICATE. For the purpose of the proper administration of this chapter and to prevent evasion of the use tax and the duty to collect the use tax, it shall be presumed that services or tangible personal property sold by any person for delivery in this state is sold for storage, acceptance, consumption or other use in this state until the contrary is established. The burden of proving the contrary is upon the person who makes the sale unless he takes from the purchaser a certificate to the effect that the property is purchased for resale. . . .

"(13) PRESUMPTION OF PURCHASE FROM RETAILER. It shall be presumed that tangible personal property shipped or brought to this state by the purchaser was purchased from a retailer for storage, use or other consumption in this state."

## I

A conclusion as to whether the personal property in question was acquired by the plaintiffs for their own use in fulfilling their agreements with the state and therefore subject to a use tax or was purchased for resale to the state[8] and consequently not subject to the imposition of a use tax requires a determination of the true object of the contracts between the parties. *Columbia Pictures Industries, Inc.* v. *Tax Commissioner,* 176 Conn. 604, 609–10, 410 A.2d 457 (1979); *United Aircraft Corporation* v. *Connelly,* 145 Conn. 176, 184–85, 140 A.2d 486 (1958); *United Aircraft Corporation* v. *O'Connor,* 141 Conn. 530, 537–38, 107 A.2d 398 (1954); *White* v. *Storer Cable Communications, Inc.,* 507 So. 2d 964, 968 (Ala. Civ. App. 1987); *Culligan Water Conditioning, Etc.* v. *State Board of Equalization,* 17 Cal. 3d 86, 96, 550 P.2d 593, 130 Cal. Rptr. 321 (1976). "The court must look to the intention of the parties to the contract to determine whether the items in a contract are held for resale or were purchased for a different purpose." *White Oak Corporation* v. *Department of Revenue Services,* 198 Conn. 413, 422, 503 A.2d 582 (1986). "That intention is to be ascertained from the language used, interpreted in the light of the situation of the parties and the circumstances surrounding them." *United Aircraft Corporation* v. *O'Connor,* supra, 538.

A careful reading of the contracts in question leads to the inescapable conclusion that the intention of the parties in contracting and the true object of each of the contracts was the furnishing by the plaintiffs, and the retention by the state, of the plaintiffs' expertise and services to establish, implement and operate the

---

[8] If, as the plaintiffs claim, the items in question were resold to the state, an exempt entity under General Statutes § 12-412 (1), such sales would not be subject to the imposition of a sales tax.

various systems of wagering desired by the state.[9] Nowhere in any of the contracts are the words "lease"

[9] The various contracts are replete with phraseology that leads to this conclusion. To repeat it all in this opinion is impossible but representative clauses from each contract are cited as examples.

(1) From AmTote's contract with the state concerning off-track betting and teletrack:

(a) "WHEREAS, the Company and the State desire to provide for mutually acceptable terms and conditions concerning the establishment and operation of such a system of off-track betting, as hereinafter set forth";

(b) "Section 4.3. As and for a continuing fee for the establishment and opening of the System and the operation thereof, all to the extent provided by this Agreement, the Company shall, in addition to the revenues provided in Section 4.1, be entitled to receive a percentage of the aggregate Handle during each Operating Year which percentage shall be calculated as follows: The percentage shall be 7.5% at an annual aggregate Handle level of $50 million and shall be reduced by .034% for each full $1 million by which such annual aggregate Handle exceeds that level but does not exceed $100 million, and shall be further reduced by .019% for each full $1 million by which such annual aggregate Handle exceeds $100 million but does not exceed $300 million."

(2) From AmTote's contract with the state concerning the daily lottery:

(a) "WHEREAS, the Company and the State desire to provide for mutually acceptable terms and conditions concerning the establishment and operation of such a Daily Lottery, as hereinafter set forth";

(b) "Section 3.03. (a) In consideration of the services to be performed hereunder, the State shall pay the Company a weekly fee which shall be a percentage of the Gross Dollar Volume for such week, which percentage shall be determined as follows";

(3) From DTP's (formerly Datatrol) contract with the state concerning the lottery games:

(a) "3.01 Datatrol shall provide, implement, operate, maintain and otherwise deliver the System for the Term and/or any Renewal Term of this Agreement, and shall do all things necessary to effectuate the terms of this Agreement as hereinafter provided."

(b) "3.09 Datatrol shall assume full responsibility to the Division for all financial transactions and for the operation of the System including, but not limited to, validations, cancellations, calculations, collections, adjustments, and payouts made by the Terminal Agents; provided, however, that notwithstanding the foregoing Datatrol shall not be responsible for any mispayments caused solely by the error or fraud of a Terminal Agent or an employee or agent of the State."

(4) From GTECH's (formerly Gaming Systems Corporation) contract with the state concerning the lottery games:

or "rental" mentioned in relation to personal property and nowhere, other than in certain clauses giving the state the option to purchase various items at set periods, are the words "sale," "sell," or "purchase" mentioned in regard to personal property.[10] Further, other than in the option clauses, nowhere in any of the contracts is there a price or rental figure established for the purchase or lease of any particular piece of equipment or any commodity. Rather, the contracts stipulate that the plaintiffs are to be compensated by the payment of a fee based on a percentage of the revenues generated by the particular system of wagering with which they are affiliated. See *U-Need-A-Roll-Off Corporation* v. *New York State Tax Commission*, 67 N.Y.2d 690, 691, 490 N.E.2d 840, 499 N.Y.S.2d 921 (1986); *Greene & Kellogg, Inc.* v. *Chu*, 134 App. Div. 2d 755, 756, 521 N.Y.S.2d 571 (1987).

As might be expected, the involvement of the state in gaming required that it maintain significant control over its operation. The extent of that control is reflected in the contractual provisions for such things as mandated licensing requirements, placement of terminals,

(a) "3.01 GSC shall provide, implement, operate, maintain and otherwise deliver the System for the Term and/or any Renewal Term of this Agreement, and the parties shall each do all things necessary to fulfill their respective obligations hereunder."

(b) "3.09 GSC shall assume full responsibility to the Division for all financial transactions and for the operation of the System, including, but not limited to, validations, cancellations, calculations, collections, adjustments and payouts made by the Terminal Agents; provided, however, that notwithstanding the foregoing, GSC shall not be responsible for any Terminal Agent delinquency or for any damages or mispayments caused solely by the error or fraud of a Terminal Agent or an employee or agent of the State."

[10] There is nothing in the record to indicate that the state ever exercised an option to purchase or that a purchase was ever considered a viable alternative by the state. Further, an option to purchase does not convert a service contract into a lease. It is the primary purpose for which the property is held that determines its taxability. *Dresser Industries, Inc.* v. *Lindley*, 12 Ohio St. 3d 68, 69, 465 N.E.2d 430 (1984).

and security procedures. The presence of state control, however, does not convert contracts for the establishment and operation of wagering systems into contracts for the sale or lease of the personal property used in operating those systems. *White Oak Corporation* v. *Department of Revenue Services,* supra, 423. Nor does the fact that agents or licensees of the state, after training by the plaintiffs, dispensed tickets and collected money alter our view that the true object of the contracts and the primary purpose of the personal property employed was to implement the systems the plaintiffs had contracted to provide, not to effect a resale.[11]

In short, we believe that the language of the agreements between the state and the plaintiffs compel a determination that the computers, computer terminals, computer components, paper stock and other personal property that the plaintiffs claim were purchased or leased for resale, although not inconsequential in utility or cost, were *incidental* to the primary purpose of the contracts which was to provide the state with wagering systems. *White Oak Corporation* v. *Department of Revenue Services,* supra, 422; see Black's Law Dictionary (5th Ed.) p. 686. It is the primary purpose for which the personal property was purchased and put to use that controls the determination of the property's taxability. *Dresser Industries, Inc.* v. *Lindley,* 12 Ohio St. 3d 68, 69, 465 N.E.2d 430 (1984); *Fliteways, Inc.*

---

[11] The plaintiffs place a great deal of reliance on the case of *Randall Park Jockey Club, Inc.* v. *Peck,* 162 Ohio St. 245, 122 N.E.2d 787 (1954), as holding that possession and control of personal property by the state compels a finding that the property was leased or sold to the state. We find *Randall Park Jockey Club, Inc.,* distinguishable from the present case. In *Randall Park Jockey Club, Inc.,* the court was interpreting a different statute and the degree of the appellant's possession and control of the vital computer functions of the track was considerably greater than that exercised by the state's agents here. Further, insofar as that case may indicate that possession and control are the determinants of taxability, we reject it.

v. *Lindley,* 65 Ohio St. 2d 21, 25, 417 N.E.2d 1371 (1981). Where, as here, the primary function and purpose of the taxpayers was to provide wagering systems and the ownership, use and maintenance of certain personal property and equipment were necessary to enable them to furnish those systems, those taxpayers, not the state, were the ultimate users or consumers of that property and equipment within the meaning of the sales and use tax statutes. *White Oak Corporation* v. *Department of Revenue Services,* supra, 423; *Boise Bowling Center* v. *State,* 93 Idaho 367, 369–70, 461 P.2d 262 (1969); *Appeal of AT&T Technologies, Inc.,* 242 Kan. 554, 561–62, 749 P.2d 1033 (1988); *Southwestern Bell Telephone Co.* v. *State Commission,* 168 Kan. 227, 232, 212 P.2d 363 (1949); *Nashville Mobilephone Co.* v. *Woods,* 655 S.W.2d 934, 937 (Tenn. 1983).

We conclude, therefore, that the plaintiffs did not purchase or lease to resell to the state the personal property for which a use tax was assessed. Rather, the property was purchased or leased for use in delivering to the state the gaming systems the plaintiffs had contracted to provide. The plaintiffs' lease or purchase of the property in question therefore was subject in each case to a use tax deficiency as determined by the commissioner and affirmed by the Superior Court. There is no error as to the use tax assessments against the plaintiffs.[12]

## II

The trial court determined, however, that "each of the plaintiffs had a firm and reasonably held belief in the correctness of its legal position and that none of them brought suit for delay." The trial court, therefore, rendered judgment that the defendant commissioner collect the use tax assessments against the

---

[12] Nor are the plaintiffs DTP and GTECH entitled to a refund on sales taxes previously paid.

plaintiffs without penalty or interest. The commissioner appeals that determination of the trial court.

The defendant commissioner does not contend that the trial court lacked authority to forgo penalties against the plaintiffs.[13] He does contend, however, that the trial court lacked authority to relieve the taxpayers of their obligations to pay the statutory interest due on their assessments. The commissioner's position is that the imposition of interest on delinquent taxes is not punitive but compensatory in nature, and that the trial court had no authority to waive it. We disagree.

General Statutes § 12-422 provides in pertinent part: "Any taxpayer aggrieved because of *any* order, decision, determination or disallowance of the commissioner of revenue services under section 12-418, 12-421 or 12-425 may . . . take an appeal therefrom to the superior court for the judicial district of Hartford-New Britain . . . . *Said court* may *grant such relief as may be equitable* . . . . " (Emphasis added.) That broad statutory grant of equitable powers has been interpreted by this court to authorize the Superior Court to set aside an assessment of interest. "We agree with the plaintiff that it was within the trial court's province to consider whether to set aside the interest imposed as part of its review of the deficiency assessment; see *Duval* v. *Brown,* [31 Conn. Sup. 373, 377, 333 A.2d 63 (1974)]; *Bowne* v. *Brown,* [30 Conn. Sup. 309, 316, 313 A.2d 426 (1973)]; but we also consider the resolution of that issue to be within the court's sound discretion." *H. B. Sanson, Inc.* v. *Tax Commissioner,* 187 Conn. 581, 587–88, 447 A.2d 12 (1982); *New England Yacht Sales, Inc.* v. *Commissioner,* 198 Conn. 624, 637, 504 A.2d 506 (1986). "The determination of what equity requires in a particular case, the balancing of the equities, is a matter for the discretion of the

---

[13] See General Statutes § 12-415 (4) and (5).

trial court." *Allen* v. *Nissley,* 184 Conn. 539, 546, 440 A.2d 231 (1981). The defendant in this instance has not persuaded us that the trial court's exercise of its discretion was clearly erroneous. *H. B. Sanson, Inc.* v. *Tax Commissioner,* supra, 588.

The defendant also argues that an interpretation of § 12-422 that would allow a court to waive the commissioner's assessment of interest would be unconstitutional because it would constitute a delegation of the commissioner's administrative function to the judiciary. We find the defendant's reasoning in this regard difficult to follow, and we also find inapposite the case of *Adams* v. *Rubinow,* 157 Conn. 150, 251 A.2d 49 (1968), on which it primarily relies.[14]

Article XX of the amendments to the Connecticut constitution expressly provides that the jurisdiction of the courts shall be defined by law.[15] In effectuating that constitutional mandate, the legislature has promulgated General Statutes § 52-1, which expressly gives the

[14] In *Adams* v. *Rubinow,* 157 Conn. 150, 251 A.2d 49 (1968), this court considered the constitutionality of 1967 legislation applicable to probate court administration.

[15] Article XX of the amendments to the constitution of Connecticut provides: "(COURTS.)

"Section 1. Section 1 of article fifth of the constitution is amended to read as follows:

"The judicial power of the state shall be vested in a supreme court, an appellate court, a superior court, and such lower courts as the general assembly shall, from time to time, ordain and establish. The powers and jurisdiction of these courts shall be defined by law.

"(SUPREME, APPELLATE AND SUPERIOR COURT JUDGES, APPOINTMENT, TERMS, REMOVAL.)

"Sec. 2. Section 2 of article fifth of the constitution is amended to read as follows:

"The judges of the supreme court, of the appellate court and of the superior court shall, upon nomination by the governor, be appointed by the general assembly in such manner as shall by law be prescribed. They shall hold their offices for the term of eight years, but may be removed by impeachment. The governor shall also remove them on the address of two-thirds of each house of the general assembly."

Superior Court the power to "administer legal and equitable rights and apply legal and equitable remedies."[16] That general grant of equitable powers has been further enhanced and defined by § 12-422, the statute pursuant to which these appeals were taken, which provides that the court "may grant such relief as may be equitable." The statute does not exclude assessments of interest from its equitable ambit. Since under § 12-422, the trial court was exercising de novo jurisdiction over the taxpayers' appeals and was not bound by the commissioner's previous rulings; *Kimberly-Clark Corporation* v. *Dubno,* 204 Conn. 137, 143–45, 527 A.2d 679 (1987); its determination did no more than carry out its constitutional and statutory mandates by affording equitable relief where that court deemed it appropriate.

There is no error.

In this opinion the other justices concurred.

---

[16] "[General Statutes] Sec. 52-1. ADMINISTRATION OF LEGAL AND EQUITABLE RIGHTS. The superior court may administer legal and equitable rights and apply legal and equitable remedies in favor of either party in one and the same civil action so that legal and equitable rights of the parties may be enforced and protected in one action. Whenever there is any variance between the rules of equity and the rules of the common law in reference to the same matter, the rules of equity shall prevail."