WMS GAMING, INC.

v.

**David M. SULLIVAN, Tax Administrator of the Division of Taxation of the State of Rhode Island.[1]**

**No. 2009–17–M.P.**

Supreme Court of Rhode Island.

Nov. 1, 2010.

---

1. David M. Sullivan was substituted as a party to this action for R. Gary Clark pursuant to Rule 25 of the District Court Civil Rules.

Jon M. Anderson, Providence, Esq., for Plaintiff.

Bernard J. Lemos, Esq., Deputy Chief of Legal Service, Division of Taxation, for Defendant.

Present: SUTTELL, C.J., FLAHERTY, and INDEGLIA, JJ.

## OPINION

Justice INDEGLIA, for the Court.

This Court granted a petition for writ of certiorari filed by the petitioner WMS Gaming, Inc. (WMS or petitioner), pursuant to G.L.1956 § 44–19–25,[2] to review a District Court judgment confirming the final decision and order of the respondent, the tax administrator of Rhode Island's Division of Taxation (division). The final decision and order upheld the division's assessment of a use tax against the petitioner on equipment, namely video lottery terminals (VLTs), which the petitioner manufactured and provided to the Rhode Island Lottery Commission (Lottery) under an agreement between the parties. Specifically, the petitioner asks this Court to review whether the agreement between the parties is a license or a lease and, depending on the outcome of this inquiry, whether the petitioner engaged in a taxable use of its VLTs in Rhode Island as a licensee. If so, the petitioner asks this Court to determine whether the Lottery consequently licensed the petitioner to use the VLTs to operate a lottery in violation of the Rhode Island Constitution, which the petitioner argues the District Court judge erroneously declined to address. After careful review of the record in this case, we conclude that the agreement was a license, that the petitioner engaged in a taxable use of the VLTs, and that the District Court judge did not err when he declined to address the petitioner's constitutional question because it was unnecessary to do so. Accordingly, we affirm the judgment of the District Court.

## I

### Facts and Travel

The Rhode Island Constitution prohibits all lotteries, except those operated by the state. R.I. Const., art. 6, sec. 15. The Lottery has the authority "to conduct and control video lottery games" in Rhode Island. G.L.1956 § 42–61.2–2(a). To carry out this authority, the Lottery "shall license technology providers capable of in-

---

**2.** General Laws 1956 § 44–19–25 provides for review by certiorari by our Court for a party aggrieved by a final order of the District Court after it has reviewed a decision of the tax administrator.

terfacing with a central communications system controlled by the [Lottery]."[3] Section 42–61.2–3(1). The petitioner, a Delaware corporation with its principal place of business in Illinois, manufactures "amusement games." In 1992, WMS and the Lottery entered into an agreement captioned "Video Lottery Terminal Technology Provider License Agreement" (agreement) under which WMS would "be licensed as a Technology Provider * * * to provide the Lottery with video lottery terminals."[4] In 1997, the parties renewed the agreement until "September 28, 2000, unless terminated earlier by the parties." Either party could terminate the agreement upon written notice within the agreement's prescribed time frames.

Under the agreement, petitioner agreed to "furnish the Lottery with the number and type of video lottery terminals as the Director [of the Lottery], in his sole discretion, from time to time, shall require." WMS's "compensation" was a statutory percentage of the "net terminal income" of the VLTs that it provided in accordance with § 42–61.2–7(a)(3)(i). The agreement required WMS to "pay all costs of any testing, examination, analysis and transportation of terminals." WMS further was obligated to provide spare parts and "training on the maintenance of their terminals" to the central communications systems provider. The petitioner also agreed "to modify its hardware and software to accommodate video game changes directed by the Lottery * * * from time to time." In addition, WMS was responsible for developing and administering at least "five player promotions per year," which were subject to the Lottery's written approval. The agreement also charged WMS with obtaining insurance on the VLTs and stated that WMS was "solely liable for any claims, loss, cost, damage, liability or expense" related to VLT malfunction.

Under the agreement, WMS provided VLTs to the Lottery. The VLTs were placed at two licensed video lottery retailers (retailers), Newport Grand and Lincoln Park,[5] both parimutuel facilities.[6] All VLTs were linked through the central communications system, which was provided by GTech, a private company that was also a licensed technology provider. On a daily basis, employees of the retailers removed the cash that their patrons placed into the VLTs and deposited it into the retailers' accounts. The retailers transferred these amounts electronically to the Lottery, which, in turn, remitted weekly the statutory percentage due to each licensed technology provider.

In 2000, the division conducted a field audit of petitioner for the period of July 1994 through June 2000. The auditor discovered that WMS had "never filed [a] use tax with the Division" during the audit period.[7] He found that WMS never had

---

**3.** "Central communication system" is defined as "a system approved by the [Lottery], linking all video lottery machines at a licensee location to provide auditing program information and any other information determined by the [L]ottery" G.L.1956 § 42–61.2–1(1).

**4.** A VLT is defined as

"any electronic computerized video game machine that, upon the insertion of cash, is available to play a video game authorized by the lottery division, and which uses a video display and microprocessors in which, by chance, the player may receive free games or credits that can be redeemed for cash. The term does not include a machine that directly dispenses coins, cash, or tokens." Section § 42–61.2–1(7).

**5.** Lincoln Park is now Twin Rivers.

**6.** "Video lottery terminals may only be installed and operated at pari-mutuel licensee facilities * * *." Section 42–61.2–2(b).

**7.** A use tax "is imposed on the storage, use, or other consumption in this state of tangible personal property * * *." G.L.1956 § 44–18–20(a). The use tax applies

paid a use tax in another state nor was charged sales tax for the materials used to construct the VLTs. During the audit period, WMS retained title to the VLTs. The auditor determined WMS's use-tax liability through an examination of internal records of WMS and municipal records. As a result of the audit, on February 20, 2001, the division issued to WMS a notice of deficiency for the unpaid use tax totaling $208,565.70.[8]

WMS timely requested an administrative hearing on March 21, 2001, which was held on August 22, 2001, before a hearing officer of the Rhode Island Department of Administration. According to the final decision and order issued by the hearing officer, "[t]he main purpose of the hearing was to allow [WMS] to present evidence and arguments that the 'video lottery terminal technology provider license agreement' between the Rhode Island Lottery Commission and WMS Gaming, Inc. is an exempt business transaction with the [S]tate of Rhode Island, not subject to sales or use tax." The decision included nearly fifty findings of fact, which reviewed the course of the audit and certain provisions of the agreement.

In her discussion of the issue, the hearing officer asserted that "[i]t is clear from the agreement that the taxpayer, as an independent contractor, is obtaining from the State of Rhode Island a license to provide a service which, but for this agreement with [t]he Lottery * * *, would be illegal." Consequently, the hearing officer found that no sale had occurred between WMS and the Lottery. Rather, she determined that WMS was "using the tangible personal property itself for purpose of financial gain." Thus, the hearing officer concluded that WMS made a taxable use of personal property in Rhode Island, and "[t]he assessment should be upheld." On June 26, 2002, the tax administrator approved the hearing officer's findings of fact and conclusions of law and forwarded the final decision and order to WMS. He advised WMS of the amount due, with interest, and its right to seek a judicial redetermination.

On July 24, 2002, petitioner filed a timely petition in the Sixth Division of the Rhode Island District Court for redetermination of the tax assessment. On March 21, 2006, petitioner moved for summary judgment, and argued that it was entitled to judgment as a matter of law because WMS did not "use" the VLTs and, moreover, it would be unconstitutional for it to do so as only the state may operate a lottery. On April 25, 2006, the District Court judge denied petitioner's motion for summary judgment and tried the *de novo* appeal on May 23 and 24, 2006.

The petitioner called one witness, Barry Greenberg, who was employed by WMS as the "lottery product manager" during the audit period. Mr. Greenberg testified that he was involved with the negotiation and execution of the agreement, and he "viewed the agreement as a lease." He said that "WMS either sells or leases [its]

---

"to purchases which occur out of state but which are in effect 'substitutes' for purchases in this state in the sense that in both cases the property is used in this state. The purpose of a use tax is twofold; to prevent tax avoidance, and to insure that the sales tax will not result in an unfair burden being placed upon the local retailer who must compete with retail dealers in other states who are exempt from the sales tax." *Great*

*Lakes Dredge and Dock Co. v. Norberg*, 117 R.I. 600, 608–09, 369 A.2d 1101, 1106 (1977) (citing *Henneford v. Silas Mason Co.*, 300 U.S. 577, 581, 57 S.Ct. 524, 81 L.Ed. 814 (1937) and *Union Oil Co. v. State Board of Equalization*, 60 Cal.2d 441, 34 Cal.Rptr. 872, 386 P.2d 496 (1963)).

**8.** The petitioner has paid the amount of the disputed tax, with interest, under protest.

product" and that he did not focus on the label of the agreement during negotiations. According to Mr. Greenberg, he viewed the agreement as a lease because WMS "maintained ownership of the property" and because WMS provided "the VLTs for the Rhode Island Lottery for them to use, for which they were paying us." He was unaware of any Rhode Island law governing such agreements.

Mr. Greenberg testified about the repair and maintenance of WMS's VLTs. According to him, WMS employees also assisted in the installation of VLTs. He testified that once the VLTs are delivered, the central systems provider, GTech, maintained the terminals. WMS trained GTech employees in the maintenance of its VLTs. Mr. Greenberg testified that WMS had staff in Rhode Island during the audit period to conduct promotions, provide training to GTech, and to update the VLTs with new games.

The respondent tax administrator presented two witnesses. It first called Gerald Aubin, who was employed as the executive director of the Lottery during the audit period. Mr. Aubin also was present when the agreement was negotiated and executed, and he was a signatory to it. According to Mr. Aubin, he did not believe that the agreement was a lease because he was precluded by statute from entering into an agreement for the lease of VLTs.

Mr. Aubin verified that under the Lottery's internal operating procedures, the technology providers could maintain the VLTs themselves or could contract with a third-party contractor, including GTech, to provide maintenance services. He testified that although GTech was responsible for maintaining the VLTs "on a day-to-day basis," licensed technology providers such as WMS would "jump in and perform those same duties" when necessary. For example, he testified that if the licensed

technology providers did "not get a quick enough response from GTech, they would take it upon themselves to do those maintenance tasks." Thus, according to Mr. Aubin, "[t]he line is truly blurred" between those who would perform maintenance on the VLTs. He testified that a WMS representative was not present at the retailer "seven days a week, but there is someone always available, and there is someone usually on the floor [of the retailer] during the week."

Mr. Aubin also testified about the testing process for each VLT. First, an outside lab tested the terminals at the expense of the licensed technology provider. Next, the computer chips containing the games were tested by GTech at Lottery headquarters to ensure that they were compatible with the central system. Finally, he testified that GTech performed a test at the retailer to ensure that the terminal was communicating with the central system. According to Mr. Aubin, if a VLT did not pass these tests, WMS would determine how to remedy the problem. He testified that WMS could "pull the game out, pull the chips out, refine it in some way, [or] go to a previous game." He testified that the licensed technology providers "continuously * * * were changing games in and out because new games create more revenue for the state and themselves."

The respondent next called Edward M. Lannon, who was employed as a senior revenue agent for the division during the audit period. Mr. Lannon conducted the audit of WMS for the period of July 1994 to June 2000. He testified about his rationale for determining that WMS was liable for Rhode Island use tax and explained the process that led to this conclusion. Mr. Lannon testified that after he reviewed the agreement in the course of his audit of WMS, he concluded that it was

not an agreement for a lease or sale because the agreement repeatedly used the word "license" while "[t]here was no reference there to a sale, rent, own or transfer in the document." Additionally, he also drew this conclusion from the absence of a UCC filing by WMS for the VLTs because, according to Mr. Lannon, nonresident lessors of property "will file with the Secretary of State's Office a UCC filing to establish that these assets are theirs." Mr. Lannon testified that he ultimately based his finding of use-tax liability on the licensing agreement and on the facts that WMS retained title to the terminals, supplied spare parts, received commissions based on the revenue that each terminal generated, and was responsible for insuring the terminals and increasing the VLTs' performance.

On December 26, 2008, the District Court judge issued a decision denying WMS's complaint and confirming the assessment of the tax administrator. He made numerous findings of fact about the agreement, the VLTs that WMS provided, and the audit of WMS. Based on these findings, the District Court judge concluded that the agreement was a licensing agreement and that WMS incurred use-tax liability for the VLTs that it provided. He found that WMS had engaged in a taxable use of its VLTs in Rhode Island "because 1.) WMS transports VLTs; 2.) WMS retains title ownership of VLTs; 3.) WMS services VLT[s]; 4.) WMS updates the games and/or computer chips of VLTs; 5.) WMS insures VLT[s]; 6.) WMS removes obsolete VLTs; 7.) WMS scraps the VLT[s]; 8.) WMS recorded no U.C.C. filing with the R.I. Secretary of State to denominate any VLTs as leased to the State of Rhode Island; and [9].) WMS exercises a substantial degree of dominion and control over VLTs within Rhode Island." He declined to address petitioner's constitutional argument because he concluded that "this case can be properly and fairly decided without reaching the constitutional question."

On January 16, 2009, WMS petitioned this Court for a writ of certiorari. On April 24, 2009, we entered an order granting the writ.[9] Before us, petitioner argues that (1) the agreement "constituted a tax-exempt lease, not a license" because the Lottery paid consideration for the VLTs that petitioner furnished and because the Lottery "exercised complete dominion and control over [the VLTs]" and (2) the Lottery could not license petitioner "to use VLTs to operate a lottery" because the Rhode Island Constitution prohibits all lotteries except those operated by the state and, therefore, it cannot be held liable for a use tax on the VLTs.

In response, the tax administrator maintains that the agreement was "a license to provide technical services" based on its "clear language," the "law of licenses," the statutory language authorizing the Lottery to enter into licensing agreements, and the intent of the parties. The respondent also argues that WMS's "actions regarding the VLTs while they were located in Rhode Island constituted a taxable use" because "WMS was continuously exercising the incidents of ownership (maintenance and upgrades) over the VLTs, during their presence in Rhode Island, so as to efficiently deliver [technical services] and maximize its income." Finally, the tax administrator asserts that petitioner's "constitutional claim is meritless."

## II

### Standard of Review

 This Court's "review of a case on certiorari is limited to an examination of

---

9. We also granted the motion of Video Lottery Consultants, Inc., for leave to file a brief as *amicus curiae*. We wish to thank Video Lottery Consultants, Inc., for its brief.

'the record to determine if an error of law has been committed.' " *State v. Greenberg*, 951 A.2d 481, 489 (R.I.2008) (quoting *Gaumond v. Trinity Repertory Co.*, 909 A.2d 512, 516 (R.I.2006)). "We do not weigh the evidence on certiorari, but only conduct our review to examine questions of law raised in the petition." *Id.* (quoting *Malachowski v. State*, 877 A.2d 649, 653 (R.I.2005)). Our review of questions of law is de novo. *Lynch v. Rhode Island Department of Environmental Management*, 994 A.2d 64, 70 (R.I.2010) (citing *Irons v. Rhode Island Ethics Commission*, 973 A.2d 1124, 1129 (R.I.2009) and *Henderson v. Newport County Regional Young Men's Christian Association*, 966 A.2d 1242, 1245 (R.I.2009)). "Moreover, 'when deciding mixed questions of law and fact that involve constitutional issues, our review is de novo.' " *Bowen v. Mollis*, 945 A.2d 314, 316 (R.I.2008) (quoting *Cassidy v. Lonquist Management Co., LLC*, 920 A.2d 228, 232 (R.I.2007)).

■ "Furthermore, this court affords great weight to findings of fact by a trial justice sitting without a jury. 'We shall not disturb the findings of the trial justice unless it is established that he or she misconceived or overlooked relevant and material evidence or was otherwise clearly wrong.' " *New England Telephone and Telegraph Co. v. Clark*, 624 A.2d 298, 300 (R.I.1993) (reviewing the District Court's judgment on a petition for a writ of certiorari filed by the tax administrator) (quoting *Cerilli v. Newport Offshore, Ltd.*, 612 A.2d 35, 39 (R.I.1992)). Thus, "[w]e must 'scour the record to discern whether any legally competent evidence supports the lower tribunal's decision * * *.' " *Murphy v. Zoning Board of Review of South Kingstown*, 959 A.2d 535, 540 (R.I.2008) (quoting *Kent County Water Authority v. State (Department of Health)*, 723 A.2d 1132, 1134 (R.I.1999)). If so, this Court "will affirm it unless one or more errors of law have so infected the validity of the proceedings as to warrant reversal." *Id.*

## III

## Discussion

### A

### Nature of the Agreement

■ As an initial matter, we must determine whether the agreement is a license or a lease. If the agreement is a lease, our inquiry ends here. A lease is considered a sale under G.L.1956 § 44-18-7(d)(1) and, therefore, the Lottery, as a state agency, would be exempt under § 44-18-30(8) from paying sales and use tax as a lessee of the VLTs. As such, the imposition of the use tax on WMS would be in error. Conversely, if the agreement is a license agreement, we then must consider the issue of whether WMS engaged in a taxable use of the VLTs. Whether the agreement is a license or a lease is a question of law that we will review *de novo*.

■ "[A] license to engage in a business, occupation or activity otherwise prohibited by law, is the granting of a privilege * * *." *Zannelli v. DiSandro*, 84 R.I. 76, 82, 121 A.2d 652, 656 (1956) (denying a boxing license to pugilist Ralph Zannelli). Therefore, "[a] license * * * is a mere privilege or permission and in no sense a contract or property." *Thayer Amusement Corp. v. Moulton*, 63 R.I. 182, 190, 7 A.2d 682, 686 (1939) (quoting *Burgess v. Mayor & Aldermen of Brockton*, 235 Mass. 95, 126 N.E. 456, 459 (1920)). As a result, "[a] license is a revocable interest under Rhode Island law." *Greater Providence Chamber of Commerce v. State*, 657 A.2d 1038, 1044 (R.I.1995). Conversely, for sales and use-tax purposes, a lease is considered a sale. Section 44-18-7(d)(1). In the context of real estate, this Court in *R.I. Marine Transportation*

*Co. v. Interstate Navigation Co.,* 52 R.I. 322, 161 A. 108 (1932), highlighted this "difference between a lease and a license":

"There is a plain difference between a license and a lease. The test to determine whether an agreement for the use of real estate is a license or a lease is whether the contract gives exclusive possession of the premises as against all the world including the owner, in which case it is a lease; or whether it merely confers a privilege to occupy under the owner, in which case it is a license, and this is a question of law arising out of the construction of the instrument." *Id.* at 323, 161 A. at 109 (quoting 1 George W. Thompson, *Commentaries on the Modern Law of Real Property* § 647 at 761 (1924)).

In this case, a review of the agreement, the relevant statutory provisions, and the record reveals that WMS was granted a license. The objective evidence indicates that the agreement created a license. First, the agreement is titled a "license agreement," and it contains the hallmarks of a license; it is revocable and confers on WMS the privilege to engage in activities otherwise prohibited by law. Contrary to WMS's contention, the license did not privilege WMS "to operate a lottery." Rather, in our view, the license granted WMS the privilege to transport VLTs into Rhode Island for participation in a state-operated lottery, to provide services aimed at increasing the VLTs' productivity, and to benefit financially from the level of that productivity.

Additionally, the agreement repeatedly refers to WMS as a "licensed technology provider" and to the agreement as a "license arrangement." It contains no reference to a lease or rental. These unambiguous licensing terms "will be applied as written" and are a strong factor in determining the true object of the agreement.

*Haffenreffer v. Haffenreffer,* 994 A.2d 1226, 1239 (R.I.2010) (quoting *Young v. Warwick Rollermagic Skating Center, Inc.,* 973 A.2d 553, 559 (R.I.2009)); *see American Totalisator Co. v. Dubno,* 210 Conn. 401, 555 A.2d 414, 417–18 (1989).

In *Dubno,* 555 A.2d at 416, the plaintiffs contracted with Connecticut's Division of Special Revenue "to provide personal property, training, personnel and services to establish systems to enable the state to conduct its lottery * * * enterprises." Use-tax deficiencies were assessed on the computers and computer terminals and components on which the plaintiffs did not pay sales tax. *Id.* The plaintiffs disputed the tax on the basis that the items taxed were purchased for resale and thus were exempt. *Id.* The Connecticut Supreme Court concluded that the true object of the contracts "was the furnishing by the plaintiffs * * * of the plaintiffs' expertise and services." *Id.* at 417. In reaching this conclusion, the court found it significant that "[n]owhere in any of the contracts are the words 'lease' or 'rental' mentioned in relation to personal property" and that "nowhere in any of the contracts is there a price or rental figure established for the purchase or lease." *Id.* at 417–18. Like the agreement in *Dubno,* here, the language of the agreement in the matter before us also strongly counsels against a conclusion that it is for the lease of the VLTs.

Moreover, the agreement's language indicating that it is a license is matched by its substance. The agreement was not for the provision of hardware alone; rather, WMS's services and expertise were essential components of the agreement. WMS was required to provide a person to assist the Lottery in testing the VLTs and "trouble shooting communication and technical problems." It also was required to train the central communications systems pro-

vider on the maintenance of the VLTs. WMS agreed to "modify its hardware and software" and to "develop and execute" at least five promotions annually. Therefore, WMS had continued involvement in the maintenance and productivity of its VLTs beyond, as it contends, merely supplying the Lottery with the terminals and offering minimal warranty guarantees. As such, the agreement's substance does not support the conclusion that it is for the lease of the VLTs.

Additionally, § 42–61.2–3(1) provides that "[t]he division shall *license* technology providers." (Emphasis added.) This section unambiguously refers to the director's power to license; nowhere does it empower the director to enter into a lease or rental agreement. We thus "must apply the statute as written." *International Brotherhood of Police Officers v. City of East Providence,* 989 A.2d 106, 108 (R.I. 2010) (quoting *In re Denisewich,* 643 A.2d 1194, 1197 (R.I.1994)). Therefore, the Lottery director acted in accordance with his statutory authority when he negotiated and entered into a "technology provider license agreement" with WMS.

The only evidence to the contrary is Mr. Greenberg's subjective belief that the agreement, which he negotiated, was for the lease of the VLTs to the Lottery since it was the typical arrangement that WMS entered into with other states. Additionally, during negotiations, he was unaware of Rhode Island law governing the licensing of technology providers. This is unavailing to petitioner's position. *See Stur-*

*bridge Home Builders, Inc. v. Downing Seaport, Inc.,* 890 A.2d 58, 66 (R.I.2005) ("Although a contract is to be construed with reference to the intent of the parties, '[t]he intention sought is only that expressed in the instrument and not some undisclosed intention that the parties may have had in mind.'" (Emphasis omitted.)). A WMS representative signed the agreement and consequently manifested assent to it. *See Shappy v. Downcity Capital Partners, Ltd.,* 973 A.2d 40, 46 (R.I.2009). The title denominating it a "Video Lottery Terminal Technology Provider License Agreement" put WMS on notice that the nature of the agreement was inconsistent with Mr. Greenberg's assumption during negotiations. *Cf. id.* (concluding that the title of a deed gave plaintiff "notice of the document's significance" before he signed it). Finally, other objective evidence bolsters the conclusion that the agreement is a license rather than a lease. For example, the lack of a UCC filing reflecting that the agreement was a lease of VLTs suggests that WMS also did not view the agreement as one.[10] *See* G.L.1956 § 6A–2.1–301 cmt. 2.

WMS avers that when the Lottery remitted a percentage of the net profits of the VLTs to WMS, this "flow" of money from the Lottery to WMS necessarily meant that the Lottery made lease payments. WMS argues that because a lessee makes payments to its lessor and a licensee pays a fee to its licensor, the agreement cannot be a license because WMS never directly paid a licensing fee to the

---

**10.** Although petitioner is correct that comment 2 of G.L.1956 § 6A–2.1–301 states that "[t]he effectiveness or enforceability of the lease contract is not dependent upon the lease contract or any financing statement or the like being filed or recorded[,]" the fact that WMS did not file the agreement or any other statement is relevant to the extent that if petitioner had so filed, it would be evidence in

favor of its argument that the agreement is a lease. Comment 2 of § 6A–2.1–301 suggests that it may be prudent for a lessor to submit a UCC filing to differentiate between a lease and a finance lease, and Mr. Lannon, in his experience as an auditor, had found that nonresident lessors would file them to protect their assets.

Lottery. However, absent the prohibition against lotteries except those operated by the state, WMS would be free to retain 100 percent of the profits earned through the operation of its VLTs in Rhode Island. For the privilege of bringing its terminals to Rhode Island and profiting from them, WMS must pay for that privilege with a fee, which is the statutory amount excised from its net profits. Section 42–61.2–7(a)(3)(i).

Given the Lottery's operational control and the need for efficiency and transparency as a state agency, it centralized the cash-collection process and handled the money itself rather than relying on each licensed technology provider to perform such an important task.[11] *Cf. In re Advisory Opinion to the Governor (Casino)*, 856 A.2d 320, 331 (R.I.2004) (defining operational control as "the power to make decisions about all aspects of the functioning of a business enterprise" and advising that allowing a private company to receive casino revenue directly, rather than the state, would be an unconstitutional delegation of operational control).[12] Accordingly, while unconventional, this "flow" does not dictate a conclusion that the agreement is a lease. *See Dubno*, 555 A.2d at 418 (concluding that the true object of the contract was not for a purchase or lease because rather than including "a price or rental figure[,] * * * the contracts stipulate[d] that the plaintiffs are to be compensated by the payment of a fee based on a percentage of the revenues generated by the particular system of wagering with which they are affiliated"). Upon closer inspection, it is clear that these payments are a license fee in the form of a percentage of WMS's VLTs' net profits rather than fixed lease payments to WMS from the Lottery.

The petitioner further directs this Court to the agreement's provision that WMS "shall receive compensation as determined pursuant to * * * § 42–61.2–7" to support its argument that the state made lease payments to WMS. However, to "compensate" is defined as to "offset." The American Heritage Dictionary 301 (2d ed.1982). Here, what WMS received from the Lottery were offsets because the amount that the state and the other statutory recipients retained was offset by WMS's share, based on the statute and as reflected in the agreement. Therefore, in our view, the agreement was not a lease of the VLTs to the Lottery, but a license granting WMS the privilege to transport VLTs to Rhode Island, to provide services intended to increase their productivity, and to enjoy a percentage of any resulting net profits.

## B

### Taxable Use

 Because we have determined the agreement to be a license, not a lease, we now must determine whether WMS engaged in a taxable use of its VLTs. Section 44–18–10 defines a taxable use as "the exercise of any right or power over tangible personal property incident to the ownership of that property * * *." "[T]he statute does not require total or even substantial control" of the property. *Great Lakes Dredge and Dock Co. v. Norberg*,

---

**11.** According to petitioner at oral argument, the retailers were agents of the state.

**12.** Although we find *In re Advisory Opinion to the Governor (Casino)*, 856 A.2d 320 (R.I. 2004) informative in regard to the functioning of a state-operated lottery, we fully acknowledge "that this Court has long held that 'while an advisory opinion rendered by this court is entitled to respect, it is advisory only, and without weight as legal precedent.' " *Irons v. Rhode Island Ethics Commission*, 973 A.2d 1124, 1132 n. 15 (R.I.2009) (quoting *Romeo v. Cranston Redevelopment Agency*, 105 R.I. 651, 656, 254 A.2d 426, 430 (1969)).

117 R.I. 600, 604, 605, 369 A.2d 1101, 1104 (1977). Rather, a taxable use may be found even when the taxpayer has "little control" over the property and when another "concurrently exercise[s] a substantial degree of control." *Id.*

In *Great Lakes Dredge and Dock Co.*, 117 R.I. at 602, 369 A.2d at 1103, the taxpayer leased several tugboats that were manned by masters and crews who were the employees of the lessors. The taxpayer directed the masters of these tugboats where and when to transport the taxpayer's scows while the masters had "full navigational control" of the tugboats and were responsible for the boats' maintenance. *Id.* at 604, 369 A.2d at 1104. The taxpayer argued "that it exercised insufficient control over the tugs to amount to a taxable 'use.'" *Id.* This Court disagreed and held that the taxpayer's right to direct the tugboats was "not insignificant." *Id.* Therefore, the taxpayer engaged in a taxable use of the tugboats even though it did not have "total" control of them because they were concurrently controlled by their masters. *Id.*

Under these principles, it is our opinion that WMS made a taxable use of the VLTs. WMS retained title to the VLTs during the audit period. It had a right as owner of the VLTs to increase their productivity, from which it would benefit. To this end, WMS exercised powers incident to its ownership of the VLTs when it fulfilled the agreement by assisting GTech in maintaining its VLTs, keeping its VLTs up-to-date with new games by installing software in the VLTs, and executing the minimum of five player promotions per year that it was obligated to develop. WMS was actively involved in ensuring that its VLTs were as profitable as possible. The petitioner continuously applied an intimate knowledge of its VLTs and an expertise to achieve this goal. In our view, this alone represents more than the minimal amount of "control" required to constitute a taxable use. *See Great Lakes Dredge and Dock Co.*, 117 R.I. at 604–05, 369 A.2d at 1104. Therefore, although GTech also exercised control over the VLTs in its general maintenance role and the Lottery exercised ultimate control over the VLTs, this concurrent control does not prevent WMS from engaging in a taxable use of its VLTs in Rhode Island. *See id.*

The District Court judge acknowledged these responsibilities in his findings of fact. He based his conclusion that WMS engaged in a taxable use of the VLTs on his findings, among others, that WMS retained title to the VLTs, "service[d]" the VLTs, "update[d] the games [and] computer chips" of the VLTs, and "exercise[d] a substantial degree of dominion and control over [the] VLTs within Rhode Island." After careful review of the record, we are satisfied that the District Court judge's decision is supported by legally competent evidence and is not clearly wrong. *New England Telephone and Telegraph Co.*, 624 A.2d at 300. Therefore, we hold that the District Court judge did not err when he found that WMS engaged in a taxable use of the VLTs.

**C**

**Constitutional Question**

██ The petitioner argues that the determinations that the agreement is a license and that WMS engaged in a taxable use of its VLTs leaves for necessary resolution petitioner's assertion that this arrangement violates the Rhode Island Constitution because only the Lottery, not petitioner, could use the VLTs to operate a lottery. The petitioner argues that the District Court judge erred when he declined to address the constitutional issue raised by petitioners because he said that the "case could be properly and

fairly decided without reaching the constitutional question." Indeed, constitutional issues should not be decided "unless it is absolutely necessary to do so." *In re Brown,* 903 A.2d 147, 151 (R.I.2006) (citing *State of Rhode Island v. Lead Industries Association, Inc.,* 898 A.2d 1234, 1238 (R.I.2006)).

In our view, the incidents of control necessary to establish a taxable use are far different from the operational control assigned to the Lottery. The agreement between WMS and the Lottery in no way affected this structure. By the petitioner's own argument, "[t]he Lottery exercised complete dominion and control over the VLTs; it had the ultimate power to exclude, that is, the power of the plug, over the VLTs at Lincoln and Newport. As such, WMS could not use the VLTs to operate a lottery." Likewise, a review of the record reveals no indication that the Lottery ever ceased to have operational control of the VLTs in violation of the Rhode Island Constitution's prohibition of lotteries except those operated by the state. We already have determined that the agreement did not privilege WMS to operate a lottery. Therefore, the District Court judge did not err when he found that it was not absolutely necessary to decide the petitioner's constitutional question, and we decline to address this issue as well.

## IV

### Conclusion

For the reasons given in this opinion, we affirm the judgment of the District Court. The record shall be remanded to the District Court with our decision endorsed on it.

Justice GOLDBERG and Justice ROBINSON did not participate.