AIRKAMAN, INC., ET AL. *v.* JOHN G. GROPPO,
COMMISSIONER OF REVENUE SERVICES
(14386)

PETERS, C. J., SHEA, CALLAHAN, GLASS and BERDON, Js.

Argued January 9—decision released April 28, 1992

752

*Edward T. Blair,* assistant attorney general, with whom, on the brief, was *Richard Blumenthal,* attorney general, for the appellant-appellee (defendant).

*Martin J. Albert,* with whom was *Richard J. DiMarco,* for the appellees-appellants (plaintiffs).

SHEA, J. The principal issue in this tax appeal is whether the trial court correctly interpreted the term "management services" in General Statutes (Rev. to 1985) § 12-407 (2) (i) (K), subsequently redesignated and referred to herein as § 12-407 (2) (i) (J), to include only management consulting services and not day-to-day operational management services.[1] After a determination by the defendant, the commissioner of revenue services, that the plaintiffs, AirKaman, Inc. (AirKaman), and Combs Gates Bradley, Inc. (Combs Gates), were liable for deficiency assessments for sales and use tax for the sale of services claimed to constitute "management services," the plaintiffs paid the tax and interest assessed, but filed claims for refund with the department of revenue services.[2] When the claims

---

[1] General Statutes (Rev. to 1985) § 12-407 (2) (i) (K) provides: "DEFINITIONS. Whenever used in this chapter . . . (2) 'Sale' and 'selling' mean and include . . . (i) the rendering of certain services for a consideration, exclusive of such services rendered by an employee for his employer, as follows . . . (K) business analysis and *management services* . . . ." (Emphasis added.)

From 1981 to 1985, the tax years in question, the pertinent subdivision was lettered "(K)." It was, however, changed to "(J)" in 1986 by an amendment that deleted a previous subdivision, requiring the relettering of all subsequent paragraphs. See Public Acts 1986, No. 86-397, § 7.

[2] See General Statutes § 12-425.

for refund were denied, the plaintiffs appealed to the Superior Court pursuant to General Statutes § 12-422.[3] That court sustained the plaintiffs' appeal, concluding that the statutory term "management services" was limited to management *consulting* services. Since the plaintiffs had not rendered any such services, the court determined that the commissioner's assessment was incorrect. The commissioner then appealed to the Appellate Court, and the plaintiffs cross appealed. We transferred the case to this court pursuant to Practice Book § 4023. We affirm in part and reverse in part.

The parties stipulated to the following facts. In September, 1969, Uniroyal, Inc. (Uniroyal), entered into a lease with the state of Connecticut in which Uniroyal agreed to manage the fixed base operation of the Oxford Airport from November 1, 1969, through October 31, 1989. Uniroyal was permitted to sublet with the approval of the state. In December, 1981, Uniroyal entered into a sublease with AirKaman, in which Air-Kaman agreed to assume Uniroyal's duties for the fixed base operation of the airport from December, 1981, through December, 1984. The sublease provided that AirKaman would receive as compensation $650 per week plus 40 percent of the net income generated. In addition, AirKaman would be reimbursed for all costs incurred in connection with the fixed base operation. In December, 1984, Uniroyal entered into a similar sublease with Combs Gates in which Combs Gates agreed to be the fixed base operator from January 1, 1985, through October 31, 1989, in exchange for $710 per

---

[3] General Statutes § 12-422 provides in relevant part: "Any taxpayer aggrieved because of any order, decision, determination or disallowance of the commissioner of revenue services under section 12-418, 12-421 or 12-425 may, within one month after service upon the taxpayer of notice of such order, decision, determination or disallowance, take an appeal therefrom to the superior court for the judicial district of Hartford-New Britain, which shall be accompanied by a citation to the commissioner of revenue services to appear before said court."

week plus 40 percent of the net income and the reimbursement of costs incurred in connection with the fixed base operation. While the subleases were in effect, Air-Kaman and Combs Gates billed Uniroyal for the management fee (the fixed weekly fee plus the percentage of profit) and for reimbursement of operating costs, which included payroll and payroll expenses, accounting fees, payroll services fees and insurance premiums.[4] Only the management fee and the reimbursement received for payroll and payroll expenses are involved in the present appeal, however, because the commissioner has conceded that the reimbursement for the other operating costs was not taxable.

In this appeal, the commissioner claims that: (1) the term "management services" in § 12-407 (2) (i) (J) includes day-to-day operational management and, therefore, the trial court incorrectly sustained the plaintiffs' appeal on the ground that the term was limited to services of a consultative nature; and (2) both the management fee and the payroll reimbursement received by the plaintiffs were taxable as consideration for the rendering of management services. Although we agree with the commissioner that "management services" includes hands-on management as well as consulting, we conclude that only the management fee, and not the amount received as payroll reimbursement, was taxable under §§ 12-408 (1) and 12-407 (2) (i) (J) as consideration for the rendering of management services.

In their cross appeal,[5] the plaintiffs maintain that the trial court improperly denied their request to amend

[4] AirKaman and Combs Gates did not charge any sales or use tax on their billings to Uniroyal.

[5] This issue should not have been raised on a cross appeal because the plaintiffs were not aggrieved by the judgment of the trial court. See Practice Book § 4005. We shall, however, consider their argument as a "claim that a new trial rather than a directed judgment should be ordered if the

their complaint to include allegations that the management services rendered were not sold "at retail" and accordingly were not taxable under General Statutes § 12-408 (1).[6] Their proposed amendment also alleged that the management services sold by the plaintiffs to Uniroyal were in turn resold to the state, thus entitling the plaintiffs to an exemption under General Statutes § 12-412 (*l*).[7] We conclude that the trial court acted within its discretion when it denied the plaintiffs' request to amend the complaint.

## I

## A

During the tax years in question, § 12-408 (1) imposed a tax on "gross receipts . . . from the rendering of any services constituting a sale in accordance with subdivision (i) of subsection (2) of section 12-407 . . . ." Among those services constituting a sale were "business analysis and management services." General Statutes § 12-407 (2) (i) (J). The commissioner maintains that the term "management services" includes operational management as well as management consulting,

[commissioner] is successful on the appeal," because the plaintiffs have filed a preliminary statement of issues within fourteen days from the filing of the commissioner's preliminary statement of the issues. Practice Book § 4013 (a) (1) (C); see also *Cioffoletti* v. *Planning & Zoning Commission,* 209 Conn. 544, 547 n.1, 552 A.2d 796 (1989).

[6] General Statutes (Rev. to 1985) § 12-408 (1) provides: "For the privilege of making any sales as defined in subsection (2) of section 12-407, at retail, in this state for a consideration, a tax is hereby imposed on all retailers at the rate of seven and one-half per cent of the gross receipts of any retailer from the sale of all tangible personal property sold at retail or from the rendering of any services constituting a sale in accordance with subdivision (i) of subsection (2) of section 12-407 . . . ."

[7] General Statutes § 12-412 (*l*) provides: "Taxes imposed by this chapter shall not apply to the gross receipts from the sale of and the storage, use or other consumption in this state with respect to the following items: (1) The United States, the state or subdivisions. Sales of tangible personal property or services to the United States, the state of Connecticut or any of the political subdivisions thereof, or its or their respective agencies."

that the language of the statute is clear on this point, thus obviating the need to look beyond the statute to other interpretive aids such as regulations and legislative history and, finally, that, even if resort is had to such interpretive aids, they reinforce the claim that day-to-day management is included in the term "management services." The plaintiffs argue that the trial court correctly concluded that the term was ambiguous and that reference to other parts of the same statute, legislative history, regulations and subsequent statutory amendments supports the interpretation of "management services" as limited to management consulting services. We agree with the commissioner that the plain language of the statute includes actual hands-on management and that the interpretive aids utilized by the trial court serve to reinforce that conclusion.

"In construing any statute, we seek to ascertain and give effect to the apparent intent of the legislature." *United Illuminating Co.* v. *Groppo,* 220 Conn. 749, 755, 601 A.2d 1005 (1992). "[T]o discern that intent, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter." *Texaco Refining & Marketing Co.* v. *Commissioner,* 202 Conn. 583, 589, 522 A.2d 771 (1987). Because the statute to be interpreted concerns the imposition of a tax, and not a taxpayer's claimed right to an exemption or deduction, we must strictly construe any ambiguity in the statute against the taxing authority and in favor of the taxpayer. *Schlumberger Technology Corporation* v. *Dubno,* 202 Conn. 412, 420–23, 521 A.2d 569 (1987).

"Where a statute . . . does not define a term, it is appropriate to focus upon its common understanding as expressed in the law and upon its dictionary

meaning." *Ziperstein* v. *Tax Commissioner*, 178 Conn. 493, 500, 423 A.2d 129 (1979). Because "management services" was not defined in the Sales and Use Taxes Act, we turn to the dictionary definition of the operative word, "management," to find its commonly approved meaning. "Management" has been defined as "the conducting or supervising of something (as a business); esp: the executive function of planning, organizing, coordinating, directing, controlling, and supervising any industrial or business project or activity with responsibility for results." Webster's Third New International Dictionary. Because actual operation of something is a commonly approved meaning of the word "management," the words "management services" in § 12-407 (2) (i) (J) logically comprehend such an activity. The statute contains no language excluding that commonly understood meaning from its purview. To adopt the plaintiffs' view that "management" does not include actual operation would ignore the word's intendment in ordinary parlance. "In the construction of the statutes, words and phrases shall be construed according to the commonly approved usage of the language . . . ." General Statutes § 1-1 (a). Accordingly, we conclude that the term "management services" includes the actual operation of a business or other concern.

In construing "management services" in § 12-407 (2) (i) (J) to mean management consulting services, the trial court referred to the preceding subdivision of the same statute, which referred to "services to industrial, commercial or income-producing real property, including but not limited to, such services as *management*, maintenance, janitorial, electrical . . . ." (Emphasis added.) The court determined that interpreting "management services" in subdivision (J) to include actual operation of a business would be redundant because such services had already been covered by the

legislature's use of the word "management" in the preceding subdivision. Attempting to reconcile what it perceived to be an incongruity in the statute, the court assigned one meaning to "management" in the preceding subdivision, i.e., day-to-day operation, and a different meaning to "management" in subdivision (J), i.e., management consulting.

The trial court's approach ignored the "familiar principle of statutory construction that where the same words are used in a statute two or more times they will ordinarily be given the same meaning in each instance." *State ex rel. Hyde* v. *Dowe,* 129 Conn. 266, 271, 28 A.2d 12 (1942). We see no redundancy in construing "management" to include day-to-day operation in both subdivisions of the statute because the preceding subdivision addresses itself to management in the real estate context, while subdivision (J) is concerned with management in the business context. In using the word management in both subdivisions, the legislature clearly intended to make the rendering of managerial services taxable in both settings. Because it decided to place two broad, service-related fields, such as real estate and business, in separate subdivisions, it logically included the word "management" within each to describe a taxable kind of service within that field. This interpretation heeds another maxim of statutory construction, that every part of a statute " 'should, so far as possible, be made operative and harmonious with every other part.' " *State* v. *Dorau,* 124 Conn. 160, 168, 198 A. 573 (1938).

Our conclusion finds further support in a regulation promulgated by the commissioner, which was in effect during the tax years in question.[8] Section

---

[8] We accord great deference and weight to the commissioner's regulatory interpretation of a statute he is charged with administering. *Phelps Dodge Copper Products Co.* v. *Groppo,* 204 Conn. 122, 128–29, 527 A.2d 672 (1987).

12-426-27 (b) (10) (b) of the Regulations of Connecticut State Agencies, which defines the statutory term "business analysis and management services," provides in pertinent part: "Management services mean and include the furnishing of a wide variety of general or specialized management consulting services, such as business analysis, business research, industrial management, marketing research, and personnel management and training." Another paragraph of the regulation provides: "The term 'includes' when used in a definition contained in this regulation shall not be deemed to exclude other things otherwise within the meaning of the term defined." Regs., Conn. State Agencies § 12-426-27 (b) (11) (k). Although the trial court concluded that the regulation supports the interpretation that "management services" means only management consulting services, we disagree with that analysis.

While the regulation obviously seeks to point out that services of a consultative nature fall within the definition of "business analysis and management services" and are thus taxable, the commissioner's use of the word "include" indicates that this definition of the statutory term is not exclusive, but that "other things otherwise within the meaning of the term defined" remain within the definition. Id. Operational management, as the commonly understood meaning of "management services," would not, therefore, be excluded from the definition. The trial court's conclusion, that only management consulting services were within the definition, was predicated on the mistaken belief that the "term defined" was management consulting services and that the regulation, therefore, did not exclude other types of management consulting services, but excluded anything other than consulting services. In fact, the "term defined" by the regulation was the statutory term, "management services," whose definition was not limited solely to consulting services.

In all likelihood, the commissioner promulgated this regulation to ensure that consulting services, which might not otherwise be regarded as "management services," because they are not thus commonly referred to, would be taxed in the same manner as operational management services, the type of services commonly understood to fall within the statutory term. The most logical reading of the regulation, given the presence of the word "include," is that it seeks to make clear that consulting services are within the definition of "management services" without excluding any other services, such as day-to-day operation, which would already be within the ordinary meaning of the statutory term.

The legislative history of § 12-407 (2) (i) (J) also indicates a definition of "management services" that is broader than management consulting services. Asked to define "management services" during the House debate on the bill, Representative James J. Clynes, then chairman of the finance committee stated, "I would say that that's an establishment primarily engaged in furnishing a wide variety of general or specialized management consulting services such as, business analysts [sic], business research, efficiency, industrial management, marketing research, personal [sic] management." 18 H.R. Proc., Pt. 7, 1975 Sess., p. 3097. When asked if his definition included the management of real estate properties, Clynes replied affirmatively. Id., pp. 3097–98. Like the regulation promulgated years later, Clynes' remarks surely include consulting services within the category of "management services." In light of Clynes' subsequent inclusion of realty management within the definition, however, it is plain that actual operation, along with consulting, was meant to be encompassed by the statutory term. In concluding that only consulting services were "management services," the trial court disregarded Clynes' remarks about realty

management, characterizing them as inadvertent and inconsistent with the thesis that only consulting services were included in the statute. We agree that Clynes' remarks were incompatible with the plaintiffs' position, but, rather than ignoring those remarks, we recognize that they buttress the commissioner's argument that "management services" includes operational management as well as consulting.

We note finally that subsequent amendments to § 12-407 (2) (i) (J) in 1989 and 1990, which we may consider in order to illuminate the legislature's intent with respect to its prior legislative action; *Baker* v. *Norwalk,* 152 Conn. 312, 317, 206 A.2d 428 (1965); lend further support to the commissioner's argument. In 1989, subdivision (J) was amended to add references to consulting and public relations services. Public Acts 1989, No. 89-251. The subdivision was amended again in 1990 to its current wording, "business analysis, management, management consulting and public relations services." Public Acts 1990, No. 90-148. The plaintiffs argue that these amendments reflect a change from the earlier version of the statute in that they made operational management services taxable when they had not been taxable previously. We disagree with this contention.

The amendments simply added "management consulting services and public relations services" to "business analysis and management services," as the subsection provided during the taxable period involved. Their apparent purpose was to resolve any question concerning management consulting services and public relations services in favor of taxability. No change was made in the scope of the term "management services." If operational management services are now taxable, as the plaintiffs implicitly concede for the purpose of this argument, it is because they were "management services" before the amendment as well as afterwards. If the members of the General Assembly

had desired to broaden the scope of that term because they viewed "management services" as limited to management consulting services, as the plaintiffs contend, they would have likely added "operational management services" to the amendments. Instead, they retained the term "management services" without change. The specific reference to management consulting services in the amendment suggests that "management services" imports a meaning distinct from those services. As we have already noted, actual operation is the commonly approved meaning of "management." The legislature's retention of that word together with its addition of consulting services is a significant indication that operational management services were taxable as "management services" under § 12-407 (2) (i) (J) during the tax years in question.

B

Having determined that the actual operation of a business is included within the term "management services," we must now consider whether both the management fee and the reimbursement for payroll and payroll expenses were taxable as a consideration for the rendering of management services under § 12-407 (2) (i) (J). The plaintiffs concede that, if the term "management services" includes the day-to-day operation of a business, the management fee would be taxable under the statute, but they argue that the reimbursement was not taxable because it was merely the return of out-of-pocket expenses incident to the operation of the airport and not a consideration paid to the plaintiffs for operating the airport. The commissioner maintains that the reimbursement also constituted consideration for the management services performed by the plaintiffs because, in each lease agreement, reimbursement is mentioned in the paragraph entitled "Compensation." We agree with the plaintiffs that only the management fee constituted a consideration for the

rendering of management services and, therefore, affirm the trial court's judgment sustaining the plaintiffs' appeal with respect to the reimbursement for payroll expenses.

To decide whether and to what extent a sales tax is applicable, we must determine the true object of the transaction between the plaintiffs and Uniroyal. *Dine Out Tonight Club, Inc.* v. *Department of Revenue Services,* 210 Conn. 567, 571, 556 A.2d 580 (1989); *American Totalisator Co.* v. *Dubno,* 210 Conn. 401, 406, 555 A.2d 414 (1989). The lease agreements between Uniroyal and the plaintiffs disclose arrangements whereby each plaintiff essentially undertook to act as Uniroyal's agent by managing the fixed base operation, which included collecting revenue and paying expenses on behalf of Uniroyal. The agreements provide: "It is expressly understood and agreed that all revenue derived and costs and expenses incurred by AirKaman [Combs Gates] in connection with the management and operation of the fixed-base operation at the Airport shall be incurred on behalf of and solely for the benefit of Uniroyal . . . ." Regarding expenditures, "[i]t is understood [that] AirKaman [Combs Gates] will pay directly certain costs of the fixed-base operation at the Airport such as payrolls, equipment usage fees, insurance, allocated overhead charges, etc. . . ." In the paragraph entitled "Compensation," the agreements state: "In consideration of the performance of the management and operations functions as set forth in paragraph 1 above, Uniroyal shall pay AirKaman [Combs Gates] an operating fee of Six Hundred Fifty Dollars ($650) [Seven Hundred ten dollars ($710)] per week during the term hereof . . . *in addition to reimbursement for all costs incurred in connection with the fixed-base operation.*" (Emphasis added.)

General Statutes § 12-408 (1) levies a tax on "any sales as defined in subsection (2) of section 12-407, at

retail, in this state *for a consideration* . . . ." (Emphasis added.) Because "consideration" is not defined in the Sales and Use Taxes Act, we look to the dictionary definition to ascertain its "commonly approved usage." General Statutes § 1-1 (a); *Ziperstein* v. *Tax Commissioner,* supra. "Consideration" means "something given as recompense," a "payment, reward." Webster's Third New International Dictionary. The commissioner's position is that, pursuant to their respective agreements with Uniroyal, the plaintiffs had agreed that part of their recompense for operating the airport would be the return to them of payroll expenses incurred on behalf of Uniroyal in the course of that operation. The notion that reimbursement for out-of-pocket expenditures could constitute a consideration for services rendered is contrary to the concept of payment or recompense. Cf. *International Business Machines Corporation* v. *Brown,* 167 Conn. 123, 132, 355 A.2d 236 (1974). According to the commissioner's view, a company that agreed to manage a business for another company and received only reimbursement for incidental expenses incurred in the management of that business and no fee or other profit from the arrangement would have to pay a tax on the reimbursement received. The imposition of a sales tax under such circumstances would be improper because a mere transfer of expenses between parties cannot be regarded as a sale of services. That is precisely the situation in this case, in which the fee earned by the plaintiffs clearly constituted payment for managerial services rendered, while the reimbursement received by them was simply the return of moneys expended by the plaintiffs on Uniroyal's behalf. Each plaintiff acted as a mere conduit for Uniroyal with respect to operational expenses and realized no recompense for its services simply by being reimbursed by Uniroyal for its outlay.

We note also that the commissioner has conceded that the reimbursement received for expenses other

than payroll was not taxable as a consideration received for the sale of services, under § 12-408 (1). The only basis offered by the commissioner for distinguishing payroll expenses from other expenses for purposes of the Sales and Use Taxes Act is his statement at oral argument that payroll is a "direct" operating expense while the other expenses, such as insurance premiums, accounting fees and other service fees, are "indirect" expenses. We fail to see in the commissioner's argument any logical basis for treating payroll reimbursement differently from reimbursement for other operating expenses. Without evidence that the payroll reimbursement included some payment to the plaintiffs for their managerial services in addition to the amounts they had expended, we conclude that such reimbursement is not taxable as a consideration for the rendering of management services.

II

We now consider the plaintiffs' argument that a new trial should be ordered because the trial court improperly denied their request to amend their complaint.[9] Some background information is necessary for the proper analysis of this claim. The plaintiffs' original three count complaint was filed in the trial court on June 15, 1987. It set forth the following claims: (1) the term "management services" does not include actual day-to-day operation; (2) even if "management services" includes operational management, the commissioner incorrectly denied in their entirety the plaintiffs' claims for refund because a portion of the amount paid was not properly taxable; and (3) the services performed by the plaintiffs were not subject to sales tax because each plaintiff was involved in a joint venture with Uniroyal.[10] A stipulation of facts was filed on

[9] See footnote 5, supra.

[10] The third claim has not been pursued by the plaintiffs in this appeal.

December 30, 1987. The commissioner filed his trial brief on November 15, 1988. On December 1, 1988, the plaintiffs filed their request for leave to amend the complaint by adding a fourth count, which alleged that the plaintiffs were entitled to an exemption pursuant to General Statutes § 12-412 (*l*) because the services they had rendered to Uniroyal were in turn resold by Uniroyal to the state pursuant to Uniroyal's lease with the state, and, therefore, no sale at retail had occurred, as required by § 12-408 (1) for the imposition of a tax. Thereafter, the commissioner filed an objection to the request to amend, which was sustained by the trial court on December 20, 1988. After the trial court had denied their subsequent motion for reconsideration, the plaintiffs filed a notice of appeal on February 13, 1989, in accordance with Practice Book § 4002.

"While our courts have been liberal in permitting amendments; *Johnson* v. *Toscano,* 144 Conn. 582, 587, 136 A.2d 341 (1987); this liberality has limitations. Amendments should be made seasonably. Factors to be considered in passing on a motion to amend are the length of the delay, fairness to the opposing parties and the negligence, if any, of the party offering the amendment. *Cummings* v. *General Motors Corporation,* 146 Conn. 443, 449–50, 151 A.2d 884 (1959). The motion to amend is addressed to the trial court's discretion which may be exercised to restrain the amendment of pleadings so far as necessary to prevent unreasonable delay of the trial. *Freccia* v. *Martin,* 163 Conn. 160, 164, 302 A.2d 280 (1972)." *Beckman* v. *Jalich Homes, Inc.,* 190 Conn. 299, 302–303, 460 A.2d 488 (1983). "Whether to allow an amendment is a matter left to the sound discretion of the trial court. This court will not disturb a trial court's ruling on a proposed amendment unless there has been a clear abuse of that discretion." *Falby* v. *Zarembski,* 221 Conn. 14, 24, 602 A.2d 1 (1992). "It is the [plaintiffs'] burden in this

case to demonstrate that the trial court clearly abused its discretion." *Kelley* v. *Bonney,* 221 Conn. 549, 591, 606 A.2d 693 (1992).

The plaintiffs claim that allowing the amendment would not have unfairly surprised the commissioner because the issues raised in the proposed amendment had previously been raised in the plaintiffs' administrative protest of the assessments. The plaintiffs maintain, moreover, that the amendment would not have occasioned any delay in the trial because all the facts necessary for analyzing the new issues were contained within the stipulation of facts that had already been filed. The commissioner maintains that the request to amend was untimely since it was filed after the commissioner had submitted his trial brief and the proposed amendment would have injected an entirely new issue into the case, which would have necessitated further factual investigation, such as the deposing of Uniroyal personnel, in order for the court to decide the "sale for resale" issue. We conclude that the plaintiffs have not demonstrated that the trial court clearly abused its discretion by forbidding the amendment.

Although it appears that the plaintiffs did raise the "sale for resale" issue when they contested the assessments at the administrative level, their original complaint in the trial court contained no such allegations. The plaintiffs waited until after the pleadings had been closed and after the commissioner had submitted his trial brief to seek permission to amend their complaint. The trial court could reasonably have concluded that additional discovery would have been necessary to adjudicate the "sale for resale" claim raised in the proposed amendment and that undue delay would have been caused thereby. This is especially true in light of the fact that the proposed amendment alleged a statutory right of exemption, unlike the claims already pleaded, which involved the propriety of imposing a tax in the

first instance. In view of these circumstances, we conclude that the trial court did not clearly abuse its discretion in denying the plaintiffs' request to amend their complaint.[11]

The judgment is affirmed with respect to the tax assessment on the reimbursement of payroll expenses received by the plaintiffs and is reversed and remanded with direction to deny the plaintiffs' appeal with respect to the tax assessment on the management fee.

In this opinion the other justices concurred.

[11] The plaintiffs have also argued the merits of the "sale for resale" claim. Because we have concluded that the trial court did not abuse its discretion in prohibiting the plaintiffs from adding such a claim to their complaint, we need not consider the argument with respect to the merits of the issue because "the charges in the complaint frame the issues to be decided by the hearing tribunal." *Veeder-Root Co.* v. *Commission on Human Rights & Opportunities,* 165 Conn. 318, 329, 334 A.2d 443 (1973).