******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

TOWN OF GROTON *v.* COMMISSIONER
OF REVENUE SERVICES ET AL.
(SC 19397)

Rogers, C. J., and Palmer, Zarella, Eveleigh, Espinosa and Robinson, Js.

*Argued January 5—officially released June 30, 2015*

*Bryan P. Fiengo*, with whom, on the brief, was *Eric W. Callahan*, for the appellant (plaintiff).

*Dinah J. Bee*, assistant attorney general, with whom, on the brief, was *George Jepsen*, attorney general, for the appellees (defendants).

*Opinion*

ROBINSON, J. The sole issue in this appeal is whether the fees that a municipality charges for refuse removal services provided to industrial, commercial, or income producing real properties are subject to the sales tax under General Statutes § 12-408 (1) (A)[1] when that municipality does not make a profit on those fees because they are either used to defray the municipality's overhead expenses in administering the refuse removal program, or to pay the service charges of other participants in the refuse disposal process. The plaintiff, the town of Groton, appeals[2] from the judgment of the trial court dismissing its tax appeal from the decision of the named defendant, the Commissioner of Revenue Services,[3] to render a sales and use tax assessment against it in the amount of $240,653.89. On appeal, the plaintiff claims, inter alia, that the trial court improperly applied numerous cases from this court, in particular *AirKaman, Inc.* v. *Groppo*, 221 Conn. 751, 607 A.2d 410 (1992), in concluding that its arrangement of refuse collection services for industrial, commercial, or income producing real properties, on a revenue neutral basis, constituted a sale for "consideration" subject to the sales tax under § 12-408 (1) (A). We agree with the plaintiff and, accordingly, reverse the judgment of the trial court.

The record reveals the following relevant undisputed facts, as found by the trial court, and procedural history. The plaintiff is a municipal corporation organized under the laws of the state of Connecticut. On or about November 13, 1985, the plaintiff became a member of the Southeastern Connecticut Regional Resources Recovery Authority (regional authority), which was formed pursuant to General Statutes § 7-273aa et seq. The regional authority operates a waste-to-energy facility (waste facility) in Preston. The plaintiff entered into a "municipal service agreement" with the regional authority, which provided the plaintiff with access to the waste facility for its disposal needs in exchange for a per ton fee. That agreement imposes a minimum delivery requirement on the plaintiff.

In August, 1998, the plaintiff adopted an ordinance that created a municipal resource recovery authority, known as the Town of Groton Resource Recovery Authority (town authority), with offices located at the plaintiff's town hall. In January, 1999, the plaintiff adopted an ordinance putting the removal, transport, and disposal of solid waste from commercial, industrial, and income producing businesses within the plaintiff's geographical area, known as "end users," under the management of the town authority. During the time period at issue in the present appeal, the plaintiff contracted with a private trash hauler to take refuse from the end users' properties to the waste facility. The end users would apply to the town authority for service

from the trash hauler, and would select the size of the necessary trash receptacles and the frequency of trash pickups from their properties; these elections would determine the fee charged by the trash hauler. The trash hauler would then transport the refuse to the regional authority's waste facility for disposal at the charge of $60 per ton.

The hauler and the regional authority bill the plaintiff for their fees on a monthly basis. The plaintiff pays the invoices of the hauler and the regional authority in full each month. After making those payments to the hauler and the regional authority, the plaintiff then bills each end user on a monthly basis for its share of the hauler's fee, the regional authority's fee, and the plaintiff's overhead expenses of $3.58 per ton of waste to administer the program.[4] The end users' monthly payments cover the payments that the plaintiff advances to the trash hauler and the regional authority; the total outlays and receipts from the end users create a " 'break even' " situation for the plaintiff, which does not profit from providing this service. The plaintiff did not apply state sales tax to the invoices that it issued to the end users, and did not remit sales tax to the defendant for these services.

Following a sales and use tax audit relating to its billings to industrial, commercial, or income producing real property for refuse and sanitary waste removal, the defendant issued a notice of assessment in the amount of $240,866.06, for sales taxes and interest due for the period from May 1, 2007, through September 30, 2010. The plaintiff subsequently filed a protest contesting the validity of that assessment with the defendant. By a letter dated September 14, 2011, the defendant denied the plaintiff's protest, and issued a revised assessment in the amount of $240,653.89.[5]

The plaintiff appealed from the decision of the defendant to the trial court in accordance with General Statutes § 12-422. The trial court concluded that the plaintiff had failed to establish that the tax assessment was incorrect, observing that refuse removal is a type of service under General Statutes § 12-407 (a) (2) (I) and (37) (I),[6] as explicated by the defendant's regulations; see Regs., Conn. State Agencies § 12-407 (2) (i) (I)-1 (g) (1);[7] and, therefore, is subject to sales tax under § 12-408 (1) (A), given that the plaintiff did "not dispute that the [defendant] met the requirement of consideration with regard to the exchange of cash by the 'end users' to the [plaintiff]." The trial court disagreed with the plaintiff's argument that, under *AirKaman, Inc.* v. *Groppo*, supra, 221 Conn. 751, "there is no sale of services where the [plaintiff] provides services and receives by way of consideration a reimbursement of its own expenses in providing such services," concluding instead that *AirKaman, Inc.*, "does not stand for a general rule that all 'conduit' situations are not subject

to sales tax," given the agency relationships established in that case, which were not present in this case. The court further concluded that, "while the [plaintiff] sends an invoice for its costs to the end users, and the end users comply by paying this invoice, there is still justification to find that there was a sale of services by" the plaintiff, which was "for a consideration." Finally, the trial court rejected the plaintiff's claim that it "is exempt from the sales tax because the function of trash removal is a traditional governmental function," observing that the plaintiff "has not demonstrated that Connecticut has a constitutional or statutory provision exempting municipalities that sell services, even if related to government functions, from the imposition of state sales tax."[8] Accordingly, the trial court rendered judgment dismissing the plaintiff's tax appeal. This appeal followed.

On appeal, the plaintiff claims, inter alia, that the trial court improperly concluded that the fees that it collected for refuse removal were subject to the sales tax. Specifically, the plaintiff contends that the trial court improperly failed to consider the " 'true object' " of the transaction in accordance with *AirKaman, Inc.* v. *Groppo*, supra, 221 Conn. 751, namely, that its fees were a mere pass-through arrangement on which it did not turn a profit in carrying out the statutorily authorized, governmental function of garbage collection via a municipal or regional authority, as distinguished from acting in a proprietary capacity for purposes of corporate benefit or profit for the municipality. Citing *Sal Tinnerello & Sons, Inc.* v. *Stonington*, 141 F.3d 46 (2d Cir.), cert. denied, 525 U.S. 923, 119 S. Ct. 278, 142 L. Ed. 2d 230 (1998), the plaintiff emphasizes that its fees were not sales or part of a commercial enterprise, but rather, were " 'benefit assessments' " to pay for the governmental function of solid waste collection. To this end, the plaintiff argues that, under the "true object" inquiry required by *AirKaman, Inc.*, unlike in the commercial profit seeking context, it was a "mere conduit" between the end users and the hauler and regional authority and, therefore, the fees that it charged were a dollar for dollar reimbursement that did not constitute the "consideration" required by § 12-407 (a) (2) (I) to render services taxable, further relying on the principle that ambiguities in taxing statutes are construed in favor of the taxpayer.

In response, the defendant contends that the trial court properly determined that refuse removal services are subject to the sales tax under the plain language of the applicable statutes and implementing regulation, namely, § 12-407 (a) (2) (I) and (37) (I), and § 12-407 (2) (i) (I)-1 (g) (1) of the Regulations of Connecticut State Agencies. Relying on *Andersen Consulting, LLP* v. *Gavin*, 255 Conn. 498, 767 A.2d 692 (2001), the defendant contends that the "true object" test of *AirKaman, Inc.* v. *Groppo*, supra, 221 Conn. 763–64, does not apply

when the service at issue "clearly falls under a relevant statute or regulation." The defendant further argues that the plaintiff's power to provide for or regulate the provision of trash removal services under General Statutes § 7-148 (c) (4) (H)[9] does not render it exempt from the sales tax, because "there is no public mandate that the refuse removal services be provided by a municipality at cost," nor any legislative intention to "exempt from sales tax the provision of those services simply because the [plaintiff]—for salutary purposes—decided to arrange and bill for the services itself," noting that General Statutes § 7-273bb (a) (9)[10] specifically authorizes municipal and regional authorities to "[c]harge reasonable fees" for those services. Citing cases upholding the imposition of sales taxes on off-street parking or extra duty police officers provided by municipalities; see, e.g., *Plainfield* v. *Commissioner of Revenue Services*, 213 Conn. 269, 567 A.2d 379 (1989); *North Hempstead* v. *Regan*, 171 App. Div. 2d 165, 574 N.Y.S.2d 851 (1991), aff'd, 80 N.Y.2d 936, 605 N.E.2d 867, 591 N.Y.S.2d 131 (1992); the defendant also contends that a municipality's decision to "[provide] services that are in the public interest to constituents does not mean that the services are not subject to the sales tax," observing that municipalities and private actors are equally subject to the sales tax when they provide the same services, regardless of profit motive. The defendant then relies on our treatment of *AirKaman, Inc.*, in *HVT, Inc.* v. *Law*, 300 Conn. 623, 16 A.3d 686 (2011), and contends that the trial court properly interpreted *AirKaman, Inc.*, in concluding that the fees collected by the plaintiff constituted consideration subject to sales tax, rather than a mere conduit or pass-through to another party, because the plaintiff provided an actual service to the end users. We disagree with the defendant, and conclude that the refuse removal fees that the plaintiff charged to the commercial, industrial, and income producing end users on a revenue neutral basis were not subject to the sales tax under § 12-408 (1) (A).

The plaintiff's claims "[present] an issue of statutory interpretation, which is a question of law over which we exercise plenary review. . . . The principles that govern statutory construction are well established. When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . In seeking to determine that meaning, General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the

statute shall not be considered. . . . When a statute is not plain and unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter . . . . We recognize that terms in a statute are to be assigned their ordinary meaning, unless context dictates otherwise . . . .

"[A]long with these principles, we are also guided by the applicable rules of statutory construction specifically associated with the interpretation of tax statutes. . . . [W]hen the issue is the imposition of a tax, rather than a claimed right to an exemption or a deduction, the governing authorities must be strictly construed against the commissioner . . . and in favor of the taxpayer. . . . Nevertheless, [i]t is also true . . . that such strict construction neither requires nor permits the contravention of the true intent and purpose of the statute as expressed in the language used." (Citations omitted; internal quotation marks omitted.) *Scholastic Book Clubs, Inc.* v. *Commissioner of Revenue Services*, 304 Conn. 204, 213–14, 38 A.3d 1183, cert. denied, U.S. , 133 S. Ct. 425, 184 L. Ed. 2d 255 (2012). Moreover, "[i]n interpreting [statutory] language . . . we do not write on a clean slate, but are bound by our previous judicial interpretations of this language and the purpose of the statute." (Internal quotation marks omitted.) *Commissioner of Public Safety* v. *Freedom of Information Commission*, 312 Conn. 513, 527, 93 A.3d 1142 (2014).

Thus, in determining whether the plaintiff's refuse removal services were supported by the "consideration" required for the imposition of a sales tax under § 12-408 (1) (A), we begin with a review of *AirKaman, Inc.* v. *Groppo*, supra, 221 Conn. 751. In that case, "Uniroyal, Inc. (Uniroyal), entered into a lease with the state of Connecticut in which Uniroyal agreed to manage the fixed base operation of the Oxford Airport from November 1, 1969, through October 31, 1989. Uniroyal was permitted to sublet with the approval of the state. In December, 1981, Uniroyal entered into a sublease with [AirKaman, Inc. (AirKaman)], in which AirKaman agreed to assume Uniroyal's duties for the fixed base operation of the airport from December, 1981, through December, 1984. The sublease provided that AirKaman would receive as compensation $650 per week plus 40 percent of the net income generated. In addition, AirKaman would be reimbursed for all costs incurred in connection with the fixed base operation. . . . While the [sublease was] in effect, AirKaman . . . billed Uniroyal for the management fee (the fixed weekly fee plus the percentage of profit) and for reimbursement of operating costs, which included payroll and payroll expenses, accounting fees, payroll services fees and

insurance premiums." Id., 753–54; see also id., 763 (observing that "[t]he lease agreements between Uniroyal and [AirKaman] disclose arrangements whereby [AirKaman] *essentially undertook* to act as Uniroyal's agent by managing the fixed base operation, which included collecting revenue and paying expenses on behalf of Uniroyal" [emphasis added]). The issue in *AirKaman, Inc.*, of import to the present case is whether the "payroll reimbursement received by [AirKaman was] taxable as consideration for the rendering of management services."[11] Id., 754.

In holding that the payroll reimbursements were not "consideration" under § 12-408 (1), this court first cited *Dine Out Tonight Club, Inc.* v. *Dept. of Revenue Services*, 210 Conn. 567, 571, 556 A.2d 580 (1989), and *American Totalisator Co.* v. *Dubno*, 210 Conn. 401, 406, 555 A.2d 414 (1989), and stated that, "[t]o decide whether and to what extent a sales tax is applicable, we must determine the true object of the transaction between [AirKaman] and Uniroyal."[12] *AirKaman, Inc.* v. *Groppo*, supra, 221 Conn. 763. It then observed that "§ 12-408 (1) levies a tax on 'any sales as defined in subsection (2) of section 12-407, at retail, in this state *for a consideration* . . . .' " (Emphasis in original.) Id., 763–64. Because the sales tax statutes did not define the term "consideration," the court then "look[ed] to the dictionary definition to ascertain its commonly approved usage, [as] something given as recompense, a payment, reward." (Internal quotation marks omitted.) Id., 764, quoting Webster's Third New International Dictionary (1971). The court emphasized that the commissioner's "*notion that reimbursement for out-of-pocket expenditures could constitute a consideration for services rendered is contrary to the concept of payment or recompense.*" (Emphasis added.) *AirKaman, Inc.* v. *Groppo*, supra, 764. The court rejected what it characterized as the "commissioner's view" that "a company that agreed to manage a business for another company and received only reimbursement for incidental expenses incurred in the management of that business and *no fee or other profit from the arrangement* would have to pay a tax on the reimbursement received. The imposition of a sales tax under such circumstances would be improper because a mere transfer of expenses between parties cannot be regarded as a sale of services. That is precisely the situation in this case, in which the fee earned by [AirKaman] clearly constituted payment for managerial services rendered, while the reimbursement received by [it] was simply the return of moneys expended by [AirKaman] on Uniroyal's behalf. [AirKaman] *acted as a mere conduit for Uniroyal* with respect to operational expenses and realized no recompense for its services simply by being reimbursed by Uniroyal for its outlay." (Emphasis added.) Id. Thus, the court concluded that, "[w]ithout evidence that the payroll reimbursement included some payment to [AirKaman]

for [its] managerial services in addition to the amounts [it] had expended . . . such reimbursement is not taxable as a consideration for the rendering of management services."[13] Id., 765.

Guided by the analytical structure of *AirKaman, Inc.*, we agree with the defendant that the applicable statutes and regulations plainly identify refuse removal services as services subject to the sales tax generally, such as when provided by a direct contractual arrangement between a property owner or manager and a commercial provider. See General Statutes § 12-407 (a) (2) (I) and (37) (I); Regs., Conn. State Agencies § 12-407 (2) (i) (I)-1 (g) (1). Nevertheless, that does not relieve us from examining the "true object" of the transaction at issue to determine whether there is "consideration" for purposes of triggering the sales tax under § 12-408 (1). See *AirKaman, Inc.* v. *Groppo*, supra, 221 Conn. 762–65; see also footnote 18 of this opinion and accompanying text.

In considering the true object of the transaction at issue in this case, we are guided by the well established proposition that "stringent control over the collection of garbage is indispensable to the public health and safety" and, therefore, municipalities validly may exercise their powers to regulate sanitation within their boundaries. *Strub* v. *Deerfield*, 19 Ill. 2d 401, 403, 167 N.E.2d 178 (1960); see also *Nehrbas* v. *Lloyd Harbor*, 2 N.Y.2d 190, 194, 140 N.E.2d 241, 159 N.Y.S.2d 145 (1957). Indeed, as the United States Court of Appeals for the Second Circuit has observed in rejecting a constitutional contracts clause challenge to a similar waste disposal scheme, "the objective of safe and efficient waste disposal undoubtedly is a legitimate public goal. Imposing the costs of solid waste disposal on an equitable, user-fee basis rather than utilizing general tax revenue is also a legitimate public goal." *Sal Tinnerello & Sons, Inc.* v. *Stonington*, supra, 141 F.3d 54; see also *USA Recycling, Inc.* v. *Babylon*, 66 F.3d 1272, 1283 (2d Cir. 1995) ("New York law makes clear that the [t]own is fulfilling a governmental duty, not making a sale, when it provides garbage services. New York municipalities have a duty to ensure proper collection and disposal of trash for the well-being and health of the community."), cert. denied, 517 U.S. 1135, 116 S. Ct. 1419, 134 L. Ed. 2d 544 (1996).

It is evident that the requisite consideration did not exist to sustain the imposition of the sales tax on the transaction in this case because the plaintiff functioned as a "mere conduit"[14] between the end users and the trash haulers and the regional authority with respect to those entities' portion of the fees levied on the end users.[15] See *AirKaman, Inc.* v. *Groppo*, supra, 221 Conn. 764. Second, the administrative overhead portion of the fee, which was a reimbursement for the expenditures incurred by the plaintiff in administering the program,

was revenue neutral and did not reflect an attempt by the plaintiff to engage in a proprietary function in competition with the private sector.[16] Rather, this fee structure is the plaintiff's attempt to consolidate and fund the important municipal governmental function of sanitation more equitably and efficiently than by using general tax revenues to pay for the expenses involved, including by outsourcing garbage pick up to a private sector vendor rather than using municipal human resources and equipment for that task.[17] See *USA Recycling, Inc.* v. *Babylon*, supra, 66 F.3d 1284–85.

Contrary to the defendant's arguments, this court's more recent decisions in *HVT, Inc.* v. *Law*, supra, 300 Conn. 623, and *Andersen Consulting, LLP* v. *Gavin*, supra, 255 Conn. 498, do not undermine the persuasive value of *AirKaman, Inc.* v. *Groppo*, supra, 221 Conn. 751, because both cases are distinguishable given that the element of "consideration" under § 12-408 (1) (A) was not at issue therein. First, we disagree with the defendant's reliance on *Andersen Consulting, LLP*, for the proposition that the true object test is inapplicable given the plain and unambiguous statutory and regulatory language rendering refuse collection service subject to the sales tax.[18] See General Statutes § 12-407 (a) (2) (I) and (37) (I); Regs., Conn. State Agencies § 12-407 (2) (i) (I)-1 (g) (1). Our application of *AirKaman, Inc.*, in the present case is not inconsistent with this court's decision not to apply the true object test in *Andersen Consulting, LLP*, because, unlike in *AirKaman, Inc.*, *Andersen Consulting, LLP*, did not raise the separate issue of whether the services whose taxability was at issue under the definitions set forth in § 12-407 were provided for "consideration" under § 12-408 (1) (A). Compare *AirKaman, Inc.* v. *Groppo*, supra, 762–65 (determining whether "actual operation of a business is included within the term 'management services' " before considering whether all of those services had been provided for "consideration"), with *Andersen Consulting, LLP* v. *Gavin*, supra, 527–28 (solely considering whether "services provided to develop, create or produce software are taxable as computer services").

Our recent decision in *HVT, Inc.* v. *Law*, supra, 300 Conn. 623, is similarly distinguishable. In that case, we concluded that an automobile leasing company was obligated to pay sales tax on the amount of the registration renewal fees that its lessees paid on its behalf directly to the Department of Motor Vehicles.[19] Id., 625–26. In so holding, we rejected the leasing company's reliance on the mere conduit analysis from *AirKaman, Inc.*, stating that *AirKaman, Inc.*, "stands for the proposition that a preexisting financial obligation of the customer cannot later be parlayed into the retailer's taxable gross receipts if the retailer first satisfies the obligation and is later reimbursed by the customer."[20] (Emphasis omitted.) Id., 637. We agree with the plaintiff that *HVT, Inc.*, is distinguishable from the present case for the

more basic reason that the existence of consideration was not an issue of law in that case, given that it was undisputed in *HVT, Inc.*, there was a "sale" for "consideration" under § 12-408 (1), namely, the underlying vehicle lease. In contrast, whether the refuse collection services facilitated by the plaintiff constituted a "sale" for "consideration" is the very issue in contention in this appeal.

Guided by the true object test and mere conduit theory set forth in *AirKaman, Inc.*, we, therefore, conclude that the trial court improperly determined that consideration existed to support the defendant's assessment of the plaintiff for sales tax in connection with its revenue neutral program for the collection of refuse generated by commercial, industrial, or income producing real properties. The trial court, therefore, improperly dismissed the plaintiff's appeal from the sales tax assessment imposed by the defendant.

The judgment is reversed and the case is remanded with direction to sustain the plaintiff's appeal.

In this opinion the other justices concurred.

[1] General Statutes § 12-408 (1) (A) provides: "For the privilege of making any sales, as defined in subdivision (2) of subsection (a) of section 12-407, at retail, in this state for a consideration, a tax is hereby imposed on all retailers at the rate of six and thirty-five-hundredths per cent of the gross receipts of any retailer from the sale of all tangible personal property sold at retail or from the rendering of any services constituting a sale in accordance with subdivision (2) of subsection (a) of section 12-407 . . . ."

We note that § 12-408 (1) (A) has been the subject of several recent amendments by our legislature. See, e.g., Public Acts 2013, No. 13-184, § 77. These amendments contain, among other things, changes to the applicable tax rate. See Public Acts 2011, No. 11-6, § 93. Because these amendments have no bearing on the merits of the present appeal, in the interest of simplicity, we refer to the current revision of the statute.

[2] The plaintiff appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[3] We note that the Department of Revenue Services is also a defendant in the present case. In the interest of simplicity, references to the defendant in this opinion include both the Department of Revenue Services and the Commissioner of Revenue Services. When necessary, we refer to these parties individually as the department and the commissioner.

[4] The plaintiff calculates the end users' monthly bills by using a chart that reflects the expenses for hauling, disposal, and overhead.

[5] The defendant determined that $182.97 of the initial sales and use tax assessment was improper, and reduced the plaintiff's tax liability accordingly. It directed the payment of a refund in the amount of $212.17 because, prior to protesting the assessment, the plaintiff had deposited a cash bond in the original assessment amount of $240,866.06.

[6] General Statutes § 12-407 (a) (2) provides in relevant part: " 'Sale' and 'selling' mean and include . . .

"(I) The rendering of certain services, as defined in subdivision (37) of this subsection, for a consideration, exclusive of such services rendered by an employee for the employer . . . ."

General Statutes § 12-407 (a) (37) provides in relevant part: " 'Services' for purposes of subdivision (2) of this subsection, means . . .

"(I) Services to industrial, commercial or income-producing real property, including, but not limited to, such services as management, electrical, plumbing, painting and carpentry . . . ."

We note that, although § 12-407 has been the subject of several recent amendments by the legislature; see, e.g., Public Acts 2011, No. 11-6, § 88; those amendments have no bearing on the merits of this appeal. In the interest of simplicity, unless otherwise noted, we refer to the current revision of the statute.

[7] Section 12-407 (2) (i) (I)-1 (g) (1) of the Regulations of Connecticut State Agencies provides: "In general. Except as otherwise provided in subdivision (2) of this subsection, services to industrial, commercial or income-producing real property mean those services set out in section 12-407 (2) (i) (I) of the general statutes (namely, management, electrical, plumbing, painting and carpentry services) and include but are not limited to such services affecting real property as roofing, siding, excavating, foundation work, plastering, heating, air conditioning, ventilation, welding, flooring, sandblasting, carpeting, elevator or escalator work, wallpapering, masonry, *refuse removal*, demolition and structural inspection." (Emphasis added.)

[8] The trial court also rejected the plaintiff's additional contention that the sales tax exemption set forth in General Statutes (Rev. to 2007) § 12-412 (95) for "tangible personal property . . . used or otherwise consumed in the operation of a solid waste-to-energy facility," applied to the transaction at issue, holding that the exemption was limited to only the regional authority's expenses in operating the waste facility. Although the plaintiff renews this claim on appeal, we need not reach its merits and, accordingly, express no opinion on that aspect of the trial court's judgment.

[9] General Statutes § 7-148 (c) provides in relevant part: "Any municipality shall have the power to do any of the following, in addition to all powers granted to municipalities under the Constitution and general statutes . . . .

"(4) . . . (H) Provide for or regulate the collection and disposal of garbage, trash, rubbish, waste material and ashes by contract or otherwise, including prohibiting the throwing or placing of such materials on the highways . . . ."

We note that, although § 7-148 has been the subject of several recent amendments by the legislature; see, e.g., Public Acts 2010, No. 10-152, § 7; those amendments have no bearing on the merits of this appeal. In the interest of simplicity, we refer to the current revision of the statute.

[10] General Statutes § 7-273bb (a) provides in relevant part: "Any municipal or regional resource recovery authority created pursuant to this chapter shall have the power to . . .

"(9) Charge reasonable fees for the services it performs and waive, suspend, reduce or otherwise modify such fees, provided such user fees shall apply uniformly within each municipality to all users who are provided with waste management services with respect to a given type or category of wastes, in accordance with criteria established by the authority, and provided further no change may be made in user fees without at least sixty days prior notice to the users affected thereby . . . ."

We note that, although § 7-273bb was amended by the legislature in 2014; see Public Acts 2014, No. 14-94, §§ 80, 81; that amendment has no bearing on the merits of this appeal. In the interest of simplicity, we refer to the current revision of the statute.

[11] The first issue in *AirKaman, Inc.*, was whether the "day-to-day operational management services" provided by AirKaman were taxable as "management services" under the definition of General Statutes (Rev. to 1985) § 12-407 (2) (i) (K). *AirKaman, Inc.* v. *Groppo*, supra, 221 Conn. 754. After engaging in an extensive review of the statute, legislative history, and regulations, this court concluded that "the actual operation of a business is included within the term management services . . . ." (Internal quotation marks omitted.) Id., 762.

[12] This court's decision in *Dine Out Tonight Club, Inc.* v. *Dept. of Revenue Services*, supra, 210 Conn. 567, illustrates the application of the "true object" test well. In *Dine Out Tonight Club, Inc.*, we first noted that, under the statutes then at issue, "[o]nly the sale of tangible personal property at retail is subject to the imposition of the Connecticut sales tax"; id., 570; and that the "Connecticut sales tax does not . . . extend to the sale of intangible rights." Id., 571. Applying the true object test, we concluded that a dining club's membership fees that entitled members to free meals at participating restaurants were not subject to the sales tax. We rejected the commissioner's argument that the membership card and restaurant directory that the club provided to its members were "tangible personal property," noting that we "must therefore ascertain whether the true object of that transaction is to provide club members with a card and a directory or to bestow upon them the intangible right to free meals under specified conditions. . . . The determinant is the intention of the parties. . . . We think that intention is evident. Obviously, prospective club members are not enticed to pay the plaintiff for the prospect of obtaining a card and a directory, items that would be of little or no value without the concomitant right to receive free meals. Conversely, the plaintiff could not expect to stay in business by

offering for sale only a card and a directory. Manifestly, the sine qua non of the transaction between the club and its members is the intangible right to receive free meals and access to the knowledge of an expanding list of restaurants that provide them. . . . The membership card and directory are merely indicia of that intangible right and incidental aids to its exercise. . . . Because the transaction between the plaintiff club and its members is essentially the conveyance of an intangible right to free meals, the plaintiff's membership fees are not subject to the imposition of the Connecticut sales tax." (Citations omitted.) Id., 572–73.

[13] We note that, in 1992, the legislature subsequently modified the sales tax statutes, specifically the definitions in § 12-407 (8) and (9); Public Acts, Spec. Sess., May, 1992, No. 92-17, §§ 21, 23; in response to *AirKaman, Inc.* v. *Groppo*, supra, 221 Conn. 751, to make clear that payroll related reimbursements are taxable aspects of "management fees," subject to certain narrow exemptions. See *Renaissance Management Co.* v. *Commissioner of Revenue Services*, 48 Conn. Supp. 221, 223–26, 838 A.2d 260 (2002), aff'd, 267 Conn. 188, 836 A.2d 1180 (2003) (per curiam).

[14] We acknowledge that the trial court cited *Mandell* v. *Gavin*, 262 Conn. 659, 816 A.2d 619 (2003), and observed that the plaintiff "does not dispute that the commissioner met the requirement of consideration with regard to the exchange of cash by the 'end users' to the [plaintiff]." In *Mandell*, this court concluded that consideration did not exist to support the imposition of a conveyance tax under General Statutes (Rev. to 2003) § 12-494 (a) when an individual taxpayer "unilaterally" transferred real property to a limited liability company of which he was the sole member, by means of a quitclaim deed expressly stating that there was "no consideration," because the company had not promised "any performance or return promise," and "neither the [taxpayer] nor the company made any promises or exchanges regarding the transfer whatsoever." Id., 669; see also id., 668–69 (noting well established legal definitions of "consideration" as requiring "bargained for . . . exchange").

We note that this court's decision in *Mandell* did not cite or limit the "mere conduit" rule set forth in *AirKaman, Inc.* v. *Groppo*, supra, 221 Conn. 764. Indeed, *Mandell*'s reasoning, holding that there was no bargained for exchange when an individual taxpayer quitclaimed real property to a limited liability company of which he was the sole member when no money or other performance was exchanged, is not inconsistent with the mere conduit theory in *AirKaman, Inc.* Finally, this concession before the trial court, to the extent it implicates a point of law concerning the interpretation of the tax statutes, is not binding upon us in any event. See, e.g., *Coley* v. *Hartford*, 312 Conn. 150, 168–69 n.14, 95 A.3d 480 (2014); *State* v. *Putnoki*, 200 Conn. 208, 219 n.6, 510 A.2d 1329 (1986).

[15] We acknowledge the defendant's reliance on this court's police extra duty cases, *Plainfield* v. *Commissioner of Revenue Services*, supra, 213 Conn. 269, and *Berlin* v. *Commissioner of Revenue Services*, 207 Conn. 289, 540 A.2d 1051 (1988), which held subject to sales tax the fees charged by towns to private entities that engaged town police officers in extra duty work in accordance with General Statutes § 7-284, despite the fact that the towns merely passed the fees on to the police officers at the contractual overtime rate after necessary deductions, and did not themselves turn a profit. These cases are distinguishable, based on both the nature of the tasks involved and the finding of consideration. In *Plainfield*, we emphasized that the nature of the task at issue, namely, the provision of police officers to provide security at the dog racing track, was "private," insofar as the legislature mandated the track pay for those services under § 7-284. *Plainfield* v. *Commissioner of Revenue Services*, supra, 272–73. We agreed with the trial court that the town, "by furnishing officers to the track, stands in essentially the same position as would a private contractor furnishing security personnel for the same purpose. Since the [town] concedes that such a private contractor would have been subject to the sales tax, we hold that the trial court did not err in resolving this issue in favor of the . . . commissioner." Id., 275–76.

In *Berlin*, we addressed whether there was sufficient consideration, and upheld the trial court's findings that there was consideration insofar as the town "benefited either directly or indirectly from the off-duty arrangement. The provision for such off-duty work in the union contract is obviously an important incentive to the [town's] police officers, both to enter police work and to approve the collective bargaining agreement. The [town] benefited to the extent that such a contract provision contributed to labor peace with its police officers. It is reasonable to conclude further that the [town] also benefited from the added police presence in the town." *Berlin* v. *Commissioner of Revenue Services*, supra, 207 Conn. 294–95. Notwithstanding the plaintiff's apparent concession in the trial court; see footnote 14 of this opinion; the trial court's finding of consideration is not consistent with the case law.

[16] Given the governmental function of garbage collection, we deem distinguishable the off-street parking cases cited by the defendant for the proposition that a municipality does not exempt itself for sales tax liability by failing

to turn a profit on a service that it provides to its constituents, namely, *North Hempstead* v. *Regan*, supra, 171 App. Div. 2d 165, and *Stamford* v. *Commissioner of Revenue Services*, Superior Court, judicial district of New Britain, Docket No. CV-99-0493545-S (December 13, 2000). Indeed, in holding that a town had to pay sales tax on receipts from the operation of an off-street parking lot, the New York Appellate Division emphasized that, under New York law, "the operation of municipal parking lots has been repeatedly held to be a proprietary function, not a governmental one," observing that off-street parking is "a service also ordinarily provided by private vendors, who, by making parking available, also serve this same public interest [of promoting traffic flow on streets] but are taxed nonetheless." *North Hempstead* v. *Regan*, supra, 167–68. Our state's leading decision on this point is generally in accord, holding in the tort immunity context that the operation of off-street parking facilities such as garages is generally a proprietary function, although that remains a question of fact and a "small or nominal fee" that is not charged "as a means to derive a profit from the activity" may well leave governmental immunity intact. *Doran* v. *Waterbury Parking Authority*, 35 Conn. Supp. 280, 282, 408 A.2d 277 (1979); see also id., 282–83 ("The operation of a ramp garage by a municipality may admittedly be in the public interest in that it lessens congestion in the streets and promotes the flow of traffic. It appears to this court, however, that the activity has traditionally been an undertaking provided in a private capacity for commercial advantage. This court cannot, in good conscience, hold that the operation of a ramp garage constitutes a governmental function.").

[17] Indeed, as was discussed at oral argument before this court, there would have been no sales tax liability for the plaintiff had it used general tax revenues to pay for garbage collection, either through contract with a private hauler or by use of municipal employees and equipment.

[18] In particular, the defendant relies on our statement in *Andersen Consulting, LLP*, that "[w]e have never applied the true object test, a judge-made rule, so as to exclude from the purview of a statute or regulation a service that, upon applying proper principles of statutory and regulatory construction and absent a finding that the service was merely incidental to the transaction, would otherwise fall under the relevant statute or regulation. Instead, we have applied the so-called true object test in generally two contexts: (1) where what would otherwise bring the transaction under the purview of the relevant taxing statute is merely incidental to the objective of the transaction . . . and (2) where the applicability of the sales tax depends on the purpose of the sale, which is necessarily a question of intent." (Citations omitted.) *Andersen Consulting, LLP* v. *Gavin*, supra, 255 Conn. 526–27.

[19] In *HVT, Inc.*, we concluded that the "renewal fees paid by lessees directly to the [Department of Motor Vehicles] are gross receipts as defined by § 12-407 (a) (9) (A)" because, under the plain language of the statute, "the retailer need not actually [receive] the payments for them to be considered gross receipts. Finally, the definition of gross receipts provides that there can be no deduction for any other expense from the payment or periodic payments from leases . . . ." (Internal quotation marks omitted.) *HVT, Inc.* v. *Law*, supra, 300 Conn. 630. We emphasized that the lessor's "preexisting—and continuing—legal obligation . . . to register and reregister its leased motor vehicles, making that activity integral to the business transaction," and noted the lack of a specific exemption for registration fees from gross receipts, unlike that provided for property tax reimbursements. Id., 630–32.

[20] We then observed that "it is undisputed that the lessees, as customers, did not have a preexisting contractual or statutory obligation to pay the renewal fees to the [Department of Motor Vehicles] before the lessees entered into their leases . . . that obligation belongs solely to the lessor, as the retailer and vehicle owner. Because the original obligation to pay the renewal fees belonged to and remained with the plaintiff, the lessees' payment of those fees to the [Department of Motor Vehicles], and, in some cases, to the plaintiff, cannot qualify as reimbursements to the plaintiff excluded from taxation under *AirKaman, Inc.*" (Emphasis omitted.) *HVT, Inc.* v. *Law*, supra, 300 Conn. 638.